## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

| | |
|---|---|
| **Teri Lynn Hinkle**<br>　　**Plaintiff,**<br><br>**vs**<br><br>**MIDLAND CREDIT**<br>**MANAGEMENT INC.**<br>**MIDLAND FUNDING, LLC.**<br>**ENCORE CAPITAL GROUP INC.**<br>　　**Defendants.** | )<br>)<br>)<br>)　**Case No. 3:13-CV-00033**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>FIRST AMENDED COMPLAINT FOR VIOLATIONS OF THE FDCPA, FCRA AND TCPA</u>

### JURISDICTION AND VENUE

1. This court has jurisdiction under 15 U.S.C. § 1681p, 15 U.S.C. § 1692k(d), 28 U.S.C § 1331 and 28 U.S.C. § 1337.

2. All conditions precedent to the bringing of this action have been performed.

3. This action arises out of violations of the Fair Credit Reporting Act, 15 U.S.C. § 1681 et seq (FCRA) by Defendants, Midland Funding, LLC, Midland Credit Management, Inc., and Encore Capital Group Inc.

4. There are violations of the Fair Debt Collections Practices Act, 15 U.S.C. § 1692 et seq. (FDCPA) by all Defendants via multiple invasions of Plaintiff, Teri Lynn Hinkle's personal privacy by Defendants in their illegal efforts to collect non-existent alleged consumer debts

First Amended Complaint - Hinkle v MCM, Midland, Encore Page 1 of 23

purported to be owed by Hinkle, hereafter "alleged accounts" as set forth below. Hinkle seeks statutory, actual and costs and any attorney's fees.

5.  The occurrences which give rise to this action occurred in Dodge County, Georgia and Hinkle resides in Dodge County, Georgia.

6.  Venue is proper in the Southern District of Georgia, Dublin Division.

## PARTIES

7.  The Plaintiff in this lawsuit is Teri Lynn Hinkle, (Hinkle), an adult natural person, who resides in Dodge County, Georgia and is a consumer as defined by 15 U.S.C. § 1681a(c), and 15 U.S.C. § 1692a(3).

8.  Defendant Encore Capital Group, Inc. ("Encore") is a "debt collector" as defined by 15 U.S.C. § 1681a(6), and a for profit corporation organized in Delaware, which has its principle place of business located in San Diego, CA, lists its San Diego Operations address as 8875 Aero Drive, Suite 200, San Diego, CA 92123 and maintains Corporation Service Company, 2711 Centerville Road, Suite 400, Wilmington, DE 19808, as its registered agent for service of process. Encore uses instrumentality of interstate commerce or the mails in a business the principle purpose of which is the collection of any debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another.

9.  Defendant Midland Funding, LLC, ("Midland") is a "debt collector" as defined by 15 U.S.C. § 1692a(6), a "furnisher of information" as defined by 15 U.S.C. § 1681s-2, a "user of information" as defined by 15 U.S.C. § 1681m, and a for-profit limited liability company organized in Delaware that is a wholly owned subsidiary of Encore, and maintains

Corporation Service Company, 40 Technology Parkway South, Suite #300, Norcross, Georgia 30092 in Gwinnet County as its registered agent for service of process. Midland uses instrumentality of interstate commerce or the mails in a business the principle purpose of which is the collection of any debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another.

10. Defendant, Midland Credit Management Inc. ("MCM"), is a "debt collector" as defined by 15 U.S.C. § 1692a(6), a "furnisher of information" as defined by 15 U.S.C. § 1681s-2, a "user of information" as defined by 15 U.S.C. § 1681m, and a for-profit corporation organized in Kansas that is a wholly owned subsidiary of Encore, has its principle place of business located in San Diego, CA and maintains Corporation Service Company, 40 Technology Parkway, South, Suite #300, Norcross, Georgia 30092 in Gwinnett County as its registered agent for service of process. MCM uses instrumentality of interstate commerce or the mails in a business the principle purpose of which is the collection of any debts, and/or regularly collects or attempts to collect, directly or indirectly, debts owed or due, or asserted to be owed or due another.

11. MCM, Midland and Encore are in fact, separate entities; as such MCM, Midland and Encore have all been named as Defendants in this Complaint.

12. According to the California Secretary of State website, MCM, Midland and Encore, operate out of the same address which is listed as: 8875 Aero Drive, Suite 200, San Diego, CA 92123.

## GENERAL ALLEGATIONS

13. Hinkle obtained her consumer credit reports from the three major consumer credit reporting agencies in May of 2011, and found entries by entities that she was unfamiliar with in the reports.

14. Hinkle found after examination of her consumer credit reports that Defendant, MCM had been reporting false and erroneous information to all three credit reporting agencies. Hinkle had never had **any** business relationship of **any** kind with MCM and had never been contacted by them.

15. MCM was reporting an alleged account on all three consumer credit reports, which did not belong to Hinkle.

16. On September 6, 2011 Hinkle filed a dispute of the validity of the entries made by MCM with all three credit reporting agencies, Equifax, Experian and Trans Union.

17. As a result of the dispute, Equifax reported the information was deleted, Experian reported the information reported was updated and would remain.  Trans Union reported the information was verified and would remain.

18. On October 20, 2011 Hinkle sent a **"Demand for Validation of Debt"** letter by USPS Certified mail to MCM regarding the alleged account it was reporting. Even though MCM knew, or should have known, that the "alleged account" was non-existent MCM failed to reinvestigate and direct the consumer reporting agencies, Experian and Trans Union, to delete the inaccurate information about Hinkle from her files. MCM continued to furnish the same false information each month thereafter to the credit reporting agencies.

19. On December 21, 2011 having ignored Hinkle's requested validation, MCM mailed a *dunning* letter to Hinkle claiming to have "**purchased**" an alleged "**debt**" and further claiming to be the servicer of the alleged account and demanded payment.

20. On December 27, 2011 MCM began calling Hinkle using an automatic telephone dialing system equipment (ATDS), while blocking the Caller ID. Hinkle answered the calls and when eventually a live voice stated it was MCM on the line, informed the "*Collectors*" each time that MCM had no business with her, no permission to call her and that they were violating consumer protection laws by doing so. The calls have continued to the present time.

21. While MCM's calls to Hinkle were made to her land line, further study of the Consumer Protection Statutes has revealed that the use of "**ATDS**" equipment and blocking the caller ID, does in fact constitute violation of the Telephone Consumer Protection Act. 47 U.S.C. § 227 et al.

22. The numerous and repeated calls after Hinkle demanded validation and MCM refused to provide it constitute a violation(s) of the Fair Debt Collection Practices Act 15 U.S.C. § 1692d(5).

23. On February 5, 2012 MCM sent a second *dunning letter* to Hinkle, *this time* acknowledging Hinkle's dispute but demanding Hinkle prove to them that the alleged debt had been paid in full, was a fraud or that Hinkle was in fact **dead**. MCM made no attempt whatsoever to comply with Hinkle's timely Demand for Validation of Debt, and ended the letter with payment instructions.

24. On April 5, 2012 MCM sent a third dunning letter offering further discounts if Hinkle would pay by May 5, 2012. MCM made no attempt whatsoever to comply with Hinkle's timely demand for validation but instead continued collection actions.

25. On May 7, 2012 MCM obtained Hinkle's Trans Union consumer credit report without a permissible purpose still ignoring Hinkle's timely Demand for Validation sent to them in October of 2011.

26. On June 15, 2012 MCM sent yet another dunning letter to Hinkle repeating the same offer of discount as was made in the April 5, 2012 letter to Hinkle. Still Defendant did not comply with Hinkle's timely Demand for Validation.

27. In June of 2012 Hinkle again obtained her consumer credit reports from all three credit reporting agencies whereby she discovered that MCM was still reporting false and erroneous information on all three reports and had added a second non-existent alleged account which Defendant, Midland was also reporting on all three credit reports.

28. On the Equifax report Plaintiff obtained in June 2012, MCM states the alleged account originated in 2002. Hinkle had no accounts with *any* entities in 2002 that could have been acquired by *any* debt collector.

29. On July 13, 2012 Hinkle disputed the entries placed on her credit reports by MCM and Midland with all three reporting agencies. As a result, MCM removed one alleged account from Trans Union but all the other entries on all three reports placed by both MCM and Midland were updated and remained.

30. On July 21, 2012 MCM sent Hinkle another "dunning letter" identical to the previous letter of February 5, 2012 in response to Hinkle's dispute and still made no attempt to validate the alleged debt.

31. On July 27, 2012 Hinkle sent a "**Notice of Intent to Sue**" letter to MCM and Midland via USPS Certified mail. Defendants have not responded to date.

32. On July 27, 2012 Hinkle sent a second Demand for Validation letter to MCM and Midland via USPS Certified mail. Defendants have not complied or responded in any way to Hinkle's demand.

33. On July 27, 2012 MCM sent Hinkle another dunning letter identical to the ones sent April 5, 2012 and June 15, 2012. There still had been no compliance with Hinkle's timely Demands for Validation.

34. MCM and Midland have continued to report false and erroneous information on Hinkle's consumer credit reports after formal dispute for a period of 18 months collectively with multiple entries between three reporting agencies. Had they performed the reasonable reinvestigation required by law they would have known definitively that the information they were furnishing was incorrect and that is should have been removed from the credit reporting agencies records.

35. Defendants have alleged that Hinkle incurred an obligation to pay money arising out of a transaction in which the money, property, insurance or services which are the subject of the transaction are primarily for personal, family or household purposes, and is therefore a "debt" as that term is defined by 15 U.S.C. § 1692a(5) and that Hinkle is obligated to pay them.

36. Hinkle denies ever having established **any** business relationship, or contractual agreement for credit, loans, or services with any of the Defendants.

37. Encore, at least "indirectly" engaged in the attempted collection of an alleged consumer debt after it had been disputed and without providing the validation timely demanded by Plaintiff. Encore is a debt buyer that owns Midland Funding LLC and Midland Credit Management

who both sent dunning letters to Plaintiff after her demand for validation and reported erroneous information to all three credit reporting agencies.

38.  MCM, having obtained Plaintiff's credit report without providing validation after repeated disputes and demands for same, did so without a permissible purpose. **"Data mining"** is not among the listed permissible purposes in the FCRA.

39. MCM, and Midland operate as a debt buying and collection enterprise. Encore is not simply a parent holding company, though it owns one hundred percent of the shares and interests in MCM and Midland. All three Defendants operate as parts of a single business operation yet routinely violate federal consumer protection statutes separately. Encore provides management and decision-making, Midland exists as an employee-less paper entity that holds title to the enterprise's purchased debt portfolios and MCM operates as the front for contact with the targeted debtor-consumers, calling itself the "servicer" of the Defendant's alleged accounts.

40. On its webpage, Encore explains that, "Encore Capitol Group, Inc. (Encore), through its subsidiaries (collectively, the **Company**), is a leading provider of debt management and recovery solutions for consumers and property owners across a broad range of assets. We purchase portfolios of defaulted consumer receivables at **deep discounts** to face value and use a variety of operational channels to maximize our collections from these portfolios. We manage our receivables by partnering with individuals as they repay their obligations and work toward financial recovery." [1]

41. By their own admission, the Defendants purchase information on accounts for far less than the amounts owed however they misrepresent the amount they have at risk by attempting to collect from consumers who are led to believe they are satisfying a debt they *may or may not*

---

[1] See http://www.encorecapital.com last visited December 18, 2012

have owed to an original creditor when in reality any original creditor will not be paid a single penny. By law the original creditor still has the right to collect as well even if the consumer is **duped** into paying the information buyer.

42. Encore does not operate independent of MCM and Midland. It does not have separate management or separate business and income. Instead, it serves as the name of the Encore family of subsidiaries, all of whom are interrelated and inseparably operated as a single business operation that is engaged in the business of purchasing ***consumer debt information*** and attempting to collect after paying pennies on the dollar for said information. Each of these entities however commits violations against consumers individually as if they were in fact separate entities.

43. When purchasing portfolios of debt information, the Defendants make an intentional business decision not to obtain competent evidence as to whether written contracts exist between the original creditors of the debts and the consumers, or if there was other documentation showing when or how the debts were incurred. There is little to no documentation beyond very rudimentary information which would allow them to calculate the amount of debt owed by a consumer ie; name, last known address, telephone number, social security number, amount alleged to be due, name of original creditor, original account number and current owner of the debt.

44. It would appear that Defendant, Encore wasted no time in violating their recent commitment to the Federal Trade Commission to correct their dishonest, illegal and egregious business practices in regard to the Consumer Protection statutes Congress saw fit to put in place.

45. Defendants are "inextricably intertwined" and/or connected in the actions alleged in this action.

46. Defendants are each the alter ego of the other.

47. The corporate fiction should be disregarded as it is being used as a means of perpetrating fraud and/or abuse of the corporate structure while routinely violating federal consumer protection statutes in an attempt to obtain unjust enrichment while accepting the risks of such violations as a mere cost of doing business.

48. Each Defendant actively participated in the acts or omissions which are the subject of this suit and sought to benefit from the actions alleged in this complaint.

49. MCM's letter in December of 2011, three months after Hinkle disputed the alleged debt and demanded validation, contains what Hinkle perceives to be an implied threat to continue damaging Hinkle's credit worthiness in an attempt to coerce her into paying them money not owed and therein stated:

   a.  "You are hereby notified that a negative credit report reflecting on your credit record may be submitted to a credit reporting agency if you fail to fulfill your credit obligations."

50. Defendants have never provided any signed verification, validation or accounting of any alleged accounts or copy of any signed contract or agreement. Defendants failed to reinvestigate the alleged accounts after dispute as required by the FCRA.

51. Defendants attempted to shift the burden of reasonable reinvestigation back on the consumer, Hinkle, by demanding that she prove to them that the alleged "account(s)" were non-existent, paid off or in fact that she was dead rather than provide validation. The burden of reinvestigation and validation is on the furnisher of the information when a timely demand for validation is made and cannot be shifted back to the consumer.

52. The amendments to the FCRA made by the Consumer Credit Reporting Act of 1996 raised the bar of compliance with the law by imposing a higher duty to reinvestigate on the **original**

**source** providing information to the credit reporting agencies. Congress clearly intended the furnishers of credit data to perform a more exacting investigation than merely parroting their own internal data which the consumer has disputed.

53. By ignoring Hinkle's timely demands for validation and disputes, in their avoidance of their legal obligation to reinvestigate and go beyond mere electronic data obtained by the purchase of unverified and unauthenticated alleged account information, Defendant has violated the clear mandate Congress intended and enacted under 15 U.S.C. § 1681s-2(b).

54. Notwithstanding Defendant's insistence that Hinkle prove to the them that the information they were consistently and continuously reporting to the consumer credit reporting agencies was erroneous, the fact remains that the FCRA requires a reasonable reinvestigation and a deletion of inaccurate information from the consumer's credit reports after said consumer has disputed the information being provided. Not only have the Defendants failed to comply with 15 U.S.C. § 1681s-2(b) by not performing a reasonable reinvestigation, they have knowingly and willfully continued to furnish unverified and unauthenticated information to the credit reporting agencies for the past 18 months.

55. Defendants have knowingly reported inaccurate information about Hinkle, after failing to reinvestigate, to the three major credit reporting agencies, Trans Union, Equifax and Experian, damaging Hinkle since at least September of 2011 in an attempt to coerce and deceive her into paying amounts not owed to them by Hinkle.

56. TransUnion, Equifax and Experian are consumer reporting agencies as defined by the FCRA, 15 U.S.C. § 1681a(f).

57. The continued reporting of false and erroneous information to the credit reporting agencies without performing proper reinvestigation after Hinkle's disputes not only violates 15 U.S.C.

§ 1681s-2(b) the first time but a violation occurs each and every time the furnisher knowingly and willfully does so.

58. Each time the Defendants furnish information to the credit reporting agencies without first performing a reasonable reinvestigation after that reinvestigation has been demanded constitutes a new and separate deliberate violation of the statute.

59. The Federal Trade Commission publication, "The Structure and Practices of the Debt Buying Industry", January 2013, contained the following findings which provide insight into the general practices of the industry and may explain the Defendant's failure to reinvestigate Hinkle's timely disputes:

   a.   The availability of documents specific to accounts in most purchase and sale agreements is not guaranteed and may not exist.

   b.   Approximately 500,000 disputed debts were not verified after dispute by the buyers in 2009 alone.

   c.   The FDCPA prohibits debt collectors, including debt buyers from seeking to recover on unverified debts but does not bar the reselling of such debts to other purchasers which likely contributes to collectors seeking to recover from the wrong consumer or the wrong amount.

   d.   The FTC used compulsory process in the study and focused on large debt buyers one of which was ENCORE CAPITAL GROUP, INC.

   e.   Purchased information often includes spread sheets containing a consumer's name, address, social security number, original creditor, date opened, date charged off and balance at charge off but no documentation of the authenticity of the information.

    f.  On average the debt buyers pay in a range from 2.2 to 7.9 cents on the dollar of amount of the alleged debt and are fully aware there is no guarantee of the validity or accuracy of the information they purchase.

    g.  In many purchase and sale agreements, sellers disclaim all warranties and representation regarding the accuracy of the information they provide at the time of the sale. Thus the buyer knowingly purchases "as is" and is therefore fully aware of the possibility of the information regarding an individual alleged account may be false or largely inaccurate.

60.  The reporting of false and erroneous information to the credit reporting agencies is a violation of the FDCPA 15 U.S.C. § 1692g which re-ages the relative statute of limitations on such violations each and every time they knowingly and willfully do it.

61.  Defendant's dissemination of inaccurate information about the Plaintiff has and is causing the following damages:

    a.  Personal expenses related to disputing the allegedly inaccurate information

    b.  Injury to her credit reputation, undue worry and loss of happiness resulting from the distribution of incorrect and disparaging information to parties both known and unknown.

    c.  A diminished credit score which may hinder Plaintiff's ability to obtain credit in the future.

62.  The Courts have consistently held that any person who willfully fails to comply with any requirement of the FCRA may be liable for punitive damages, 15 U.S.C. § 1681n. To establish willful noncompliance, a plaintiff must prove that the defendant(s) "knowingly and intentionally committed an act in conscious disregard for the rights of others' need not show 'malice or evil motive.'" Hinkle has repeatedly attempted to resolve the controversy over the

disputed alleged account(s) with the Defendants to no avail over a substantial length of time. For this reason Hinkle had no other recourse beyond litigation to resolve these matters.

63. There is no debt as to the basis of this instant action, rather the basis is the illegal, unconscionable and invasive behavior of all three Defendants in their attempts to collect non-existent alleged debt from Hinkle. Hinkle has attempted on multiple occasions to provide Defendants the opportunity to cure said egregious behavior to no avail.

## COUNT I

**VIOLATIONS OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. §1681, WILLFUL NON-COMPLIANCE BY DEFENDANT MIDLAND CREDIT MANAGEMENT, INC.**

64. Paragraphs 1 through 63 are re-alleged as though fully set forth herein.

65. Discovery of violations brought forth herein occurred from May of 2011 to present and are within the statute of limitations as defined in the FCRA, 15 U.S.C. § 1681p.

66. Hinkle is a consumer within the meaning of the FCRA, 15 U.S.C. § 1681a(c).

67. Trans Union, Equifax and Experian are credit reporting agencies within the meaning of the FCRA, 15 U.S.C. § 1681a(f).

68. Consumer credit report is a consumer report within the meaning of the FCRA, 15 U.S.C. § 1681a(d).

69. The FCRA, 15 U.S.C. § 1681b defines the permissible purposes for which a person may obtain a consumer credit report.

70. Such permissible purposes as defined by 15 U.S.C. § 1681b are generally, if the consumer makes application for credit, makes application for employment, for underwriting of Insurance involving the consumer, or is offered a bona fide offer of credit as a result of the Inquiry.

71. Hinkle has never had any business dealings or any accounts with, made application for Credit from, made application for employment with, applied for insurance from, or received a bona fide offer of credit from the Defendant, MCM.

72. On May 7 of 2012 MCM obtained the Trans Union consumer credit report for Hinkle with no permissible purpose in violation of the FCRA, 15 U.S.C. § 1681b. Hinkle had no account whereby MCM could claim permissible purpose and said actions were a clear violation of her privacy. No claim of permissible purpose connected to the collection of a debt could exist because MCM was fully aware the **"alleged accounts"** they were claiming to **"own"** and **"service"** were in dispute and they had not **"validated"** them as per Hinkle's timely demand.

73. At no time did Hinkle give her consent for MCM to acquire her consumer credit report from any credit reporting agency.

74. The actions of MCM obtaining the consumer credit report of Hinkle with no permissible purpose or her express consent was a willful violation of FCRA, 15 U.S.C. § 1681b committed with actual malice and an egregious violation of Hinkle's right to privacy.

75. From September of 2011 to present MCM has been, as a direct result of its failure to conduct a reasonable reinvestigation, willfully and knowingly reporting information purported to be in connection with Hinkle which it knew was false and inaccurate to all three credit reporting agencies, Equifax, Experian and Trans Union in clear violation of the FCRA 15 U.S.C. § 1681s-2(b).

76. To date MCM has committed at least thirty five separate violations of 15 U.S.C. § 1681s-2(b) by deliberately failing to reinvestigate before reporting to the consumer reporting agencies to the best of Hinkle's knowledge. Further violations may be identified in the discovery process.

77. Hinkle, by filing disputes with the consumer reporting agencies in September of 2011 and *again in July of 2012*, invoked her private right of action to assert claims against MCM arising under 15 U.S.C. § 1681s-2(b).

78. At no time has MCM ever provided any valid justification they may have had for obtaining Hinkle's credit report or reporting false information to the credit reporting agencies. MCM had a duty to properly ascertain if there was any **legitimate** permissible purpose before obtaining Hinkle's credit report and MCM breached said duty. There was no account that MCM had any right to collect to have had permissible purpose to obtain Hinkle's credit report and therefore Hinkle is entitled to damages for breach of said duty.

79. Hinkle made multiple attempts to dispute and provided ample opportunity for MCM to engage in mitigation of damages and reach a settlement for their violations before taking civil action against them. Hinkle was not able to settle this matter with MCM prior to litigation however that was not for lack of trying.

WHEREFORE, Plaintiff demands judgment for damages against Defendant, MIDLAND CREDIT MANAGEMENT for statutory damages for each violation, actual damages, punitive damages to be decided at trial and any attorney's fees and costs pursuant to 15 U.S.C. § 1681n.

## COUNT II

### VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681, WILLFUL NON-COMPLIANCE BY DEFENDANT MIDLAND FUNDING, LLC.

80. Paragraphs 1 through 79 are re-alleged as though fully set forth herein.

81. Since July of 2012 Defendant, Midland, as a direct result of its failure to conduct a reasonable reinvestigation, has continuously reported information which it knew to be false

and inaccurate to all three credit reporting agencies, Equifax, Experian and Trans Union in blatant violation of the FCRA 15 U.S.C. § 1681s-2(b).

82. To date Midland has committed at least 13 separate violations of 15 U.S.C. § 1681s-2(b) by deliberately failing to reinvestigate before reporting to the consumer reporting agencies, to the best of Hinkle's knowledge. Further violations may be identified during the discovery process.

83. Hinkle, by filing a dispute with the consumer reporting agencies in July of 2012, invoked her private right of action to assert claims against Midland arising under 15 U.S.C. § 1681s-2(b).

84. At no time has Midland ever provided any valid justification they may have had for reporting false information to the credit reporting agencies even though Hinkle made a timely demand that they do so. Midland had a duty to properly ascertain if there was any **legitimate** account belonging to Hinkle before reporting such information to the credit reporting agencies. Midland breached said duty. There was no account that Midland had any right to collect to have had lawful standing and authority to report on Hinkle's credit reports and therefore Hinkle is entitled to damages for breach of said duty.

85. Hinkle made multiple attempts to dispute and provided ample opportunity for Midland to engage in mitigation of damages and reach a settlement for their violations before taking civil action against them. Hinkle was not able to settle this matter with Midland prior to litigation however it was not for lack of trying.

WHEREFORE, Hinkle demands judgment for damages against Defendant, MIDLAND FUNDING LLC. for statutory damages for each violation, actual damages, punitive damages to be decided at trial and any attorney's fees and costs pursuant to 15 U.S.C. § 1681n.

## COUNT III

### VIOLATION OF THE FAIR CREDIT REPORTING ACT, 15 U.S.C. § 1681, WILLFUL NON-COMPLIANCE BY DEFENDANT ENCORE CAPITAL GROUP, INC.

86. Paragraphs 1 through 85 are re-alleged as though fully set forth herein.

87. By its own admission on its web site Defendant, Encore provides management and decision-making for Defendants Midland and MCM.

88. Encore is therefore, in violation of the FCRA 15 U.S.C. § 1681b by and in direct consequence to, its decision to have MCM obtain Hinkle's credit report without permissible purpose in May of 2012.

89. Encore is also directly and equally responsible with MCM and MIDLAND for the cumulative forty eight, and possibly more, separate violations of 15 U.S.C. § 1681s-2(b) by their failure to assure that a proper reinvestigation was conducted after Hinkle's disputes.

WHEREFORE, Hinkle demands judgment for damages against Defendant, ENCORE CAPITAL GROUP INC. for statutory damages for each violation, actual damages, punitive damages to be decided at trial and any attorney's fees and costs pursuant to 15 U.S.C. § 1681n.

## COUNT IV

### VIOLATIONS OF THE FAIR DEBT COLLECTION PRACTICES ACT (FDCPA), 15 U.S.C. § 1692 BY DEFENDANTS MIDLAND CREDIT MANAGEMENT, MIDLAND FUNDING, LLC, AND ENCORE CAPITAL GROUP INC.

90. Paragraphs 1 through 89 are re-alleged as though fully set forth herein.

91. Defendants, MCM and Midland by reporting an "alleged" debt as a "debt collector" to a consumer reporting agency generated a "communication" in connection with the collection of a debt which they knew was incorrect and a violation of the FDCPA 15 U.S.C. § 1692e(8).

92. Defendant, Midland failed after initiating first communication in connection with the collection of a debt to provide the required "Thirty Day Validation Notice" or disclosures to Plaintiff which constitutes a violation of the FDCPA 15 U.S.C. § 1692g(a)(1), 2),(3),(4),(5).

93. Defendants, MCM and Midland made a false representation to the three Consumer Reporting Agencies, Equifax, Experian and Trans Union on multiple occasions as to the character, amount or legal status of an alleged debt which results in violations of the FDCPA, 15 U.S.C. § 1692e(2).

94. The FDCPA requires that a "debt collector" cease collection efforts until debt is validated if a consumer has demanded such in a timely manner. Defendants, MCM and Midland blatantly ignored Hinkle's timely demand for validation and are still engaging in collection actions, resulting in multiple violations of 15 U.S.C. 1692g(b).

95. Defendant, MCM after refusing to respond to Hinkle's demand for validation harassed her with numerous collection calls repeatedly in violation of FDCPA, 15 U.S.C. § 1692d and d(5).

96. By its own admission on its web site, Encore provides management and decision-making for Defendants Midland and MCM.

97. Encore is therefore, complicit in each of the above FDCPA violations by and in direct consequence to its decisions to allow MCM and Midland to commit said violations and in its continuing decision to refuse to cease and desist until providing Hinkle with timely demanded validation.

98. None of the three Defendants have produced any evidence or factual documentation of any "alleged debt" Hinkle could be responsible for and have continued to violate the consumer protection statutes.

99. Hinkle has never had any business relationship with any of the three Defendants.

100. Hinkle has no "alleged accounts" which any of the three Defendants could claim ownership of.

101. Defendants have produced no evidence or factual documentation of any "alleged debt" Hinkle could be responsible for but have violated Hinkle's rights with impunity for nearly two years and possibly longer.

102. A purchase of Hinkle's personal information does not constitute a contractual obligation between Hinkle and any of the three Defendants.

103. **The FDCPA broadly prohibits unfair or unconscionable collection methods, conduct which harasses, oppresses or abuses any debtor, and any false, deceptive or misleading statements, in connection with the collection of a debt.**[2]

WHEREFORE, Hinkle demands judgment for damages against each Defendant, MIDLAND CREDIT MANAGEMENT, INC., MIDLAND FUNDING, LLC., and ENCORE CAPITAL GROUP, INC. for statutory damages, actual damages, and any attorney's fees and costs pursuant to 15 U.S.C. § 1692 et seq.

## COUNT V

## VIOLATIONS OF THE TELEPHONE CONSUMER PROTECTION ACT (TCPA), 47 U.S.C. § 227, BY DEFENDANT MIDLAND CREDIT MANAGEMENT, INC.

---

[2] The Fair Debt Collection Practices Act ("FDCPA") is a comprehensive statute which prohibits a catalog of activities in connection with the collection of debts by third parties. *See* 15 U.S.C § 1692 et seq. The FDCPA imposes civil liability on any person or entity that violates its provisions, and establishes general standards of debt collector conduct, defines abuse, and provides for specific consumer rights. 15 U.S.C. § 1692k. The operative provisions of the FDCPA declare certain rights to be provided to or claimed by debtors, forbid deceitful and misleading practices, both generally and in a specific list of disapproved practices.

104. Paragraphs 1 through 103 are re-alleged as though fully set forth herein.

105. From December 27, 2011 forward MCM, using ATDS equipment as defined by 47 U.S.C. § 227(a)(1)(A)(B), while blocking Caller ID, placed numerous calls to Plaintiff's home telephone without prior express consent.

106. Hinkle, on several occasions informed the collector/operator that she had no business as defined by 47 U.S.C. § 227(a)(2), with MCM, had not given permission to call her, the calls were a violation of the consumer protection laws and demanded they stop. The calls have continued to the present time.

107. While MCM's calls to Hinkle were made to her land line, further study of the Telephone Consumer Practices Act, (TCPA), has revealed that the use of "automatic telephone dialing system" equipment while blocking the caller ID, does in fact constitute violations of the statute:

   a. 47 U.S.C. § 227(b)(A), to make any call (other than a call made for emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice-

      1) (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call;

   b. 47 U.S.C. § 227(b)(B), to initiate any telephone call to any residential telephone line using an artificial or prerecorded voice to deliver a message without the prior express consent of the called party, unless the call is initiated for emergency purposes or is exempted by rule or order by the commission under paragraph (2)(B).

108. Hinkle expressly instructed MCM to communicate with her in writing only in her Demand for Validation letters therefore MCM was fully aware they would be in violation of the TCPA prior to placing the first call to Hinkle's home.

109. Hinkle does not have an established business relationship within the meaning of 47 U.S.C. § 227, with MCM and Hinkle never gave express consent for MCM to call her at any time.

110. The TCPA provides a private right of action as stated in 47 U.S.C. § 227(b)(3):

    a.  A person or entity may, if otherwise permitted by the laws or rules of court of a State, bring in an appropriate court of that State-

        (A) an action based on a violation of this subsection or the regulations prescribed under subsection to enjoin such violation,

        (B) an action to recover for actual monetary loss from such a violation, or to receive $500 in damages for each such violation, whichever is greater, or

        (C) both such actions. If the court finds that the defendant willfully or knowingly violated this subsection or the regulations prescribed under this subsection, the court may, in its discretion, increase the amount of the award to an amount equal to not more than 3 times the available under subparagraph (B) of this paragraph.

WHEREFORE, Plaintiff demands judgment for damages against Defendant, MIDLAND CREDIT MANAGEMENT, INC., pursuant to 47 U.S.C. § 227(b)(3)(A)(B)(C) in the amount of $500.00 for the first call and $1,500.00 per call for each and every successive call thereafter as knowing and or willful violations of the TCPA.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury of all issues so triable as a matter of law.

Dated: June 24, 2013

Respectfully Submitted,

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023
478-374-4132

Service to:
Midland Credit Management, Inc.
8875 Aero Drive, Suite #200
San Diego, California 92123
Registered Agent: Corporation Service Company
40 Technology Parkway South, Suite #300
Norcross, Georgia 30092

Midland Funding, LLC.
8875 Aero Drive, Suite #200
San Diego, California 92123
Registered Agent: Corporation Service Company
40 Technology Parkway South, Suite #300
Norcross, Georgia 30092

Encore Capital Group, Inc.
8875 Aero Drive, Suite #200
San Diego, California 92123
Registered Agent: Corporation Service Company
2711 Centerville Road, Suite #400
Wilmington, DE 19808

**DuPont™ Tyvek®**
**Protect What's Inside™**

Schedule package pickup right from your home or office at usps.com/pickup
Print postage online - Go to usps.com/postageonline

PLEASE PRESS FIRMLY

RECIPIENT
The sender has requested notification upon delivery.
Immediately upon receipt, please telephone:
NAME: _____
Tel. No.: ( ) _____

PLEASE PRESS FIRMLY

Place Mailing Label

PRESS HARD. YOU ARE MAKING 3 COPIES.

FOR PICKUP OR TRACKING
Visit WWW.USPS.COM
Call 1-800-222-1811

EXPRESS
MAIL

EP13C

Please Recycle

Visit us at usps.com

EXTREMELY URGENT

Please Rush To Addressee

UNITED STATES POSTAL SERVICE

EXPRESS
MAIL

For Domestic and International Use

Mailing Envelope

When used internationally
affix customs declarations
(PS Form 2976, or 2976A)

U.S. POSTAGE
PAID
EASTMAN, GA
31023
JUN 13
$14.10
00198060-06

Addressee Copy
Label 11-B, March 2004

Post Office To Addressee

CUSTOMER USE ONLY

ORIGIN (POSTAL SERVICE USE ONLY)

DELIVERY (POSTAL SERVICE USE ONLY)

TO: (PLEASE PRINT)

FROM: (PLEASE PRINT)

EI 353 876 370S