IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
DUBLIN DIVISION


TERI LYNN HINKLE,              *
                               *  CASE NUMBER:
     Plaintiff,                *  3:13Cv-33
vs.                            *
                               *
                               *  **TRANSCRIBED FROM**
MIDLAND CREDIT MANAGEMENT,     *  **ELECTRONIC RECORDING**
INC.,                          *
                               *  Augusta, Georgia
     Defendant.                *  May 7, 2014
_____ *

             TRANSCRIPT OF MOTION TO COMPEL HEARING

            Before the Honorable BRIAN K. EPPS

               United States Magistrate Judge

APPEARANCES: (VIA TELECONFERENCE)

FOR THE PLAINTIFF:
TERI LYNN HINKLE, Pro Se

FOR THE DEFENDANT:
MATTHEW B. AMES
Balch & Bingham, LLP
30 Ivan Allen Jr., Blvd., NW
Suite 700
Atlanta, Georgia  30308
(404) 962-3531

ALSO PRESENT:
K. ANN BROUSSARD

TRANSCRIBED BY:
C. Joan Mobley
U.S. District Court Reporter, CCR, CVR-M
P.O. Box 1316
Brunswick, Georgia  31521
(912) 280-1348

1          *(P R O C E E D I N G S)*

2            *(Call to Order 3:04 p.m.)*

3          THE CLERK:  The Court calls case number 3:13CV-33,

4  *Teri Lynn Hinkle versus Midland Credit Management, Incorporated*,

5  represented by Matthew Ames.  We are here for a teleconference.

6          THE COURT:  Good afternoon, Everyone.

7          MS. HINKLE:  Good afternoon.

8          MS. BROUSSARD:  Good afternoon, Your Honor.

9          MR. AMES:  Good afternoon, Your Honor.

10          THE COURT:  Mr. Ames, I appreciate the brief that you

11  filed with the latest update on where things stand.

12          Ms. Hinkle, I guess that email that you sent to him on

13  May 5th at 10:37 p.m. that outlines your current state of

14  outstanding issues, the ones that remain?

15          MS. HINKLE:  Yes, their email and my email in reply.

16          THE COURT:  That's right.  Your email dated May 5th at

17  10:37 p.m.

18          MS. HINKLE:  Right.

19          THE COURT:  So those are the outstanding issues left

20  of all the ones that you had originally raised?

21          MS. HINKLE:  Yes, sir.

22          THE COURT:  Well, first of all, let me congratulate

23  you guys on making significant progress on your own.  Certainly

24  we always like to see the parties working together to get things

25  resolved, and there has been a lot of hard work, I am sure, to

1    get us to where we sit right now.

2           Ms. Hinkle, I have been looking at all your stuff very

3    carefully, my clerk and I have, and so with the ones that you

4    have outstanding now I think maybe the best way to start this is

5    for me to just tell you my gut reaction to your email on both

6    counts, and then, if you don't mind, let me hear your thoughts

7    in response.  Is that okay with you?

8           MS. HINKLE:  All right.  Thank you.

9           THE COURT:  So with your first issue where you say

10   that, look, these documents that are attached to the surreply

11   brief, the latest brief filed by the Defense, attachments A-1

12   through D-1 or D-2, I think it is, I think what you are saying

13   is, look, first of all, it was missing pages.  And so then you

14   gave me a second report of the same information so now we have

15   all three pages and it is clear that pages 2 and 3 are blank,

16   but now your concern has shifted because the reports contain

17   more information now than they did in the original report; is

18   that right?

19          MS. HINKLE:  Partially.  The information that is

20   inserted that wasn't there before, first of all, makes them not

21   identical to the first ones, but especially if you have it in

22   front of you, the attachment C-1 and C-2.

23          THE COURT:  Let me get to that.

24          All right.

25          MS. HINKLE:  It's the best way to point out the

1    example.

2            On C-1 at the top, it shows there a balance and that's

3    because while the other documents that they had given me prior

4    to previously claimed that the account had been paid in full in

5    2008.  Now I definitely did not do that but all of the documents

6    show that it had a zero balance.  On the new one, C-2, now it

7    shows $880.80.  Now interestingly, that amount of $880.80 is the

8    exact amount they claim is owed on the other alleged account.

9            THE COURT:  Well, Ms. Hinkle, first of all, I think it

10   says $300.80.

11           MS. HINKLE:  Yeah, I am sorry.  Three hundred.  You

12   are right.  I am looking at a distance.

13           THE COURT:  I think this is a good example and one

14   where I think I can help you a little bit and kind of explain

15   what my role is.

16           My role is to make sure that if you have requested

17   documents that are relevant to your lawsuit that I am here to

18   make sure the Defendant gives you the documents that you

19   requested.

20           What I am not here to do is talk about things like

21   inconsistencies between one report they give you and another.

22   And all you and I can do right now is speculate as to why the

23   first report shows zero at the top and the second one shows

24   $300.80.

25           So at this point, those kinds of issues don't really

1  go to the question of whether they are producing the documents

2  that are responsive to the requests for production you sent

3  them.  What you are getting in now is to the kind of detail that

4  you are only going to be able to explore in a deposition

5  setting.

6         MS. HINKLE:  All right.  I understand that.

7         On that same document the request was to produce

8  everything in their possession in regard to compliance with the

9  FCRA, and it is definitely incomplete because it shows they

10 stopped reporting to the credit reports in 2009.  I didn't even

11 know about this if it wasn't for the credit reports in 2011 and

12 so the document --

13        THE COURT:  That is what you think the document

14 suggests but you don't know until you depose someone and say am

15 I correct that this report shows the very last date that you

16 reported this debt to a credit reporting agency?  The answer

17 presumably will be, yes, that's what it shows, but it might be

18 something else and then you can ask the follow-up question of,

19 well, then why is it this is still showing up on my credit

20 report if the last report date is March of 2009.  That is stuff

21 that you and I can't talk about in the context of a motion to

22 compel.  All I can do at this stage is say what did you request

23 and Defendant have you given them that.  And it sounds like the

24 answer is, yes; they have produced the documents that you have

25 requested.  Now you have to schedule a deposition and ask those

1   questions to determine whether there are inconsistencies and

2   some evidence that you can use to support your case.

3          MS. HINKLE:  All right.  I had decided that this

4   particular issue, Request Number 5, I would be unlikely to get

5   any more than what I have gotten anyway.

6          THE COURT:  Well in a deposition setting you might get

7   a little further.  You might say is this the be all and end all?

8   Is there another report out there that will explain more?  And

9   it may be in that setting the knowledgeable designee from the

10  company may say well you know what, come to think of it, there

11  is another report.  We didn't give you everything.  Hold on a

12  minute.  Let me go get somebody to print that report for you but

13  we can't speculate right now.  All we can do is look at your

14  request, ask the Defendants is this everything, and when they

15  say yes, unless there is some burning evidence or specific

16  indication that there is more they are not giving you that is

17  really all we can do for now.

18         MS. HINKLE:  All right.  I accept that.

19         THE COURT:  And it sounds like then with respect to

20  this first issue of these reports now that you have seen pages 2

21  and 3, the blank pages, you are concerned about whether they

22  have intentionally omitted anything in response to the request.

23  You really don't have that concern anymore; is that right?

24         MS. HINKLE:  Well, I am very familiar with data entry

25  software.  I don't know what software they are using.  I have

1   personally never seen one that creates blank pages.  It just

2   creates a page as you need it when you reach the bottom of the

3   page.

4          I am not objecting to that.  I was objecting to being

5   told the first time that they had given me everything that they

6   had in response and in the second set things were so different

7   and then there were also two letters that they had not produced

8   the first time, so obviously my question would be what else

9   didn't you produce this time.

10         THE COURT:  Well, and like I said, you can point to

11  some specific evidence that you've got, something that really

12  strongly suggests they are playing games with you and they are

13  not producing the full file that you have asked for then

14  certainly I want to hear about that.  But it sounds like right

15  now you are pretty reasonably satisfied you have everything, and

16  you have to take some depositions to see whether these other

17  speculations of yours might actually have some substance to

18  them.  Is that a fair characterization of where we sit?

19         MS. HINKLE:  I would say on that issue that it is.  I

20  may not need to based on what they did give me and the facts of

21  the case.

22         THE COURT:  Okay.  Now, Ms. Hinkle, moving on to the

23  second item that you have in your email, and I read these things

24  carefully because I want to make sure that you have your day to

25  explain what you think you are missing and certainly to the

1    extent that the Defendants are not giving you something I want

2    to make sure they do.

3            But to be honest with you, when I read your second

4    bullet point in this email I scratched my head because if you

5    look back at the requests that you mention, 6 and 8, the essence

6    of those requests is, hey, you say I owe you money.  You give me

7    proof of that.  You show me where there is some contract out

8    there where you have the right to claim that debt is yours.

9    Where did you buy my debt from?  What accounts did you buy that

10   show I owe somebody money and you bought it from them,

11   essentially?  Is that a fair characterization of 6 and 8?

12           MS. HINKLE:  Just a moment.  I wanted to look at 6 and

13   8, and I was being interrupted very briefly.

14           THE COURT:  I did not characterize that very well but

15   that is the essence of it, I think.

16           MS. HINKLE:  Okay.  Let me look at how it was worded.

17   I just had it.

18           THE COURT:  I have a copy here.  The first one, 6, do

19   you have that with you now?

20           MS. HINKLE:  Yes.

21           THE COURT:  The first one, produce the contract

22   obligating the Plaintiff to pay any alleged debt to you or any

23   other entity for which you claim you are authorized to collect

24   the debt.

25           The second, produce the sale agreement containing

1    essentially your personal identifiers connected with any alleged

2    account purported to belong to the Plaintiff which you claim to

3    have the legal right to collect.

4            So in both of those the common theme is there, what is

5    your source?  Well how in the world do you Midland claim that I

6    owe you money?  Where did you buy my debt from?

7            And it looked like the information they gave you in

8    response gave you every piece of that puzzle you needed but then

9    I read your stuff and you said well wait a minute.  I am not

10   even interested in that.  That is not really what I am

11   interested in.  And I am thinking well, goodness.  That is what

12   the request asked for.  So I couldn't understand what you were

13   trying to get at there.

14           MS. HINKLE:  I might should have worded it better.

15   What I was getting at, it doesn't really matter to me where they

16   got it because in the first place it wasn't mine so I don't care

17   about that.  What it relayed to or referred to was what did you

18   do when you attempted to reinvestigate after I disputed.  In

19   their interrogatories they said they went back to the seller,

20   then in response to this production they gave me the two bills

21   of sale and they say that is all they did to investigate after I

22   disputed.  That is what this issue is.  Then in the bills of

23   sale it clearly says in both of them that the sale was made

24   without warranty or recourse - one of them is in capital letters

25   - and there is nothing else attached to it; no indication as to

1    what those sales were comprised of or even if they had anything

2    to do with me, but when, generally, the phrase without recourse

3    and without representations or warranty pretty much means don't

4    come back to us if you have a problem; however, they say they

5    did go back to them.  The purchasing agreement will spell out

6    specifically what possible reason they could have to expect that

7    these two other previous buyers would have been able to give

8    them anything more than they already had to verify or validate.

9    That is why I asked for the purchasing agreements because it

10   spells out exactly what they could expect to get from the seller

11   beyond what they already got.  If there was no expectation that

12   they could get anything from the seller, then they would have

13   known that that would not constitute a proper reinvestigation

14   under the FCRA.

15        THE COURT:  So forgive me for being somewhat dense,

16   what documentation do you believe is out there that they have

17   not produced that you want?

18        MS. HINKLE:  On the reinvestigation under the

19   (s)(2)(B) they are required to do a proper reinvestigation to

20   ascertain the validity or verification of the debt that they are

21   reporting on the credit report.

22        THE COURT:  And so if they say if the credit report

23   shows that you owe Midland $5.00 and you dispute that then

24   Midland has to go back and say, oh, well, how in the world did

25   we claim that she owes us $5.00?  What is our documentation that

1    supports that, right?

2           MS. HINKLE:  Well under the law they have to

3    investigate it.

4           THE COURT:  Exactly.  They have to go back to their

5    files and make sure they have evidence that you owe them that

6    $5.00.

7           MS. HINKLE:  Right.  But information that does not

8    match and is not correct that they purchased from another buyer

9    just information they have in their own records as to what they

10   purchased does not verify or validate that information.  That is

11   just parroting their own internal information.  That doesn't

12   prove that what they have is correct.

13          THE COURT:  This is the way I look at it.  I think

14   where things stand is you say I dispute it.  I don't owe you

15   $5.00 Midland and then you say show me how I owe you $5.00, and

16   so in response Midland comes back and says, look, you weren't a

17   customer of ours.  You were a customer of someone else's.  You

18   failed to pay them the $5.00 that you owed them and then we

19   bought the debt from somebody else.  Here is the contract where

20   we bought the debt and here is the exhibit to the contract that

21   shows the specific account we bought in regards to you and the

22   $5.00 that you owe.  And it appears that they gave you that

23   contract where they bought the debt that included your account.

24   Would you agree with that?

25          MS. HINKLE:  No.  This is not the contract.  This is

1  the just a copy of a bill of sale.

2          THE COURT:  So you are saying when they bought your

3  account, when they bought the debt arising out of your account

4  with someone else, GE or I think a sale account on the other,

5  that there was more documentation that went along with the

6  purchase agreement than what they are giving you so far?

7          MS. HINKLE:  There was more connected to the bill of

8  sale.  There is the purchase agreement which spells out the

9  terms of the purchase because I am not disputing an amount.  I

10  am disputing the existence.

11          THE COURT:  Okay.  So I guess at this point I would

12  turn to Mr. Ames to enlighten us about whether there is more to

13  this agreement and any arguments by the Defense that the rest of

14  the agreement shouldn't be produced and is not relevant.

15          MR. AMES:  I appreciate that, Your Honor.

16          In terms of the account purchase agreement or what is

17  referred as the forward flow agreement in Ms. Hinkle's May 5th

18  email, I think we have really four concerns.  The first is a

19  procedural matter, and I will confess I was not a participant in

20  the conferrals that occurred between Ms. Hinkle on the one hand

21  and Ms. Broussard on the other so if I misspeak I hope that

22  someone will correct me, but as a procedural matter in terms of

23  discharging the duty to confer in good faith, in my review of

24  the emails and brief writing and everything that preceded

25  today's call, this explanation of relevance that we just heard

1    is the first time that that theory has been communicated to

2    Midland so we would just purely as a procedural matter express a

3    concern that this has been sort of a changing theory of

4    relevance that has been difficult for us to pin down.

5              In terms of the substance, the time line alone I think

6    negates this notion that the account purchase agreement somehow

7    bears relevance to what investigation the Midland entity and

8    Encore may or may not have done subsequent to acquiring Ms.

9    Hinkle's account.  The time line is this: we acquire bundles of

10   accounts all at once pursuant to this forward flow agreement.

11   There is a bill of sale that accompanied each specific account,

12   and that is the only piece of paper that identifies Ms. Hinkle

13   specifically.  And then if there is a dispute, which Ms. Hinkle

14   contends there is, then we would investigate but we can't start

15   investigating a dispute relating to an account that we own until

16   we own the account so this notion that the agreement that gave

17   us title to the debt in the first place somehow reflects actions

18   that we took afterwards just as a matter of logic and the time

19   line doesn't make sense to us.

20             In terms of the content, the account purchase

21   agreement or this forward flow agreement that Ms. Hinkle

22   described, that is sort of a master agreement between the seller

23   on the one hand and Midland Funding on the other and that is the

24   vehicle that enabled the transfer of many accounts, sometimes

25   hundreds or even thousands of accounts, at once, and that just

1  describes general commercial terms that are highly sensitive and
2  proprietary to us.  The nature of the relationship between the
3  buyer and the seller overarching the amount that we acquired
4  this bundle of accounts for, you know, venue in the event of a
5  dispute; dispute resolution mechanism, those kinds of things.
6  The only document that bears on Ms. Hinkle's account
7  specifically is the bill of sale that we gave to her.  The
8  overarching commercial terms that don't relate to her
9  specifically have no logical bearing on what we did or did not
10 do to discharge our obligations under the statute that she cites
11 1681(s)(2).  So there is a timing issue in terms of the time
12 line and there is a relevance issue.
13         I just mentioned the concern a moment ago that these
14 are very sensitive business terms to us.  I mean, what we pay to
15 acquire debt goes to the heart of our business and has no
16 rational relationship to any of the claims in the case but the
17 dissemination of that data could be used for an improper purpose
18 and it could be devastating to our business.  We could be under
19 bid on future deals if our competitors knew our method of doing
20 business and what we paid.  And I will add, parenthetically I
21 understand that on numerous occasions we attempted to negotiate
22 the terms of a protective order in this case and Ms. Hinkle
23 refused to entertain that, so that gives us great concern that a
24 document that doesn't appear to be relevant is something that is
25 of such keen interest to her.

1          THE COURT:  Let me ask you this, Mr. Ames.  Would you

2    be agreeable to producing the full agreement if I sign the

3    protective order?

4          MR. AMES:  I don't know that my client would be over

5    joyed about that either.

6          THE COURT:  The inquiry is not whether your client

7    would be over joyed.

8          MR. AMES:  I understand.

9          MS. HINKLE:  Your Honor, may I clarify?

10          THE COURT:  Yes, you may.  If it is with respect to

11    the protective order, I don't have much patience for you being

12    difficult on that.  Protective orders are standard fare in

13    litigation.  It serves a very important purpose in the

14    competitive business environment that most defendants operate

15    within and so I don't understand why you would give them grief

16    on that.  You can't on the one hand insist on knowing everything

17    about your account and on the other hand not give them

18    protection they need to produce the information.

19          MS. HINKLE:  Okay.  Partially that is what I want to

20    clarify.

21          I have no objection to a specific protective order.

22    My only objection was that they be specific with me as to what

23    it was they wanted to protect.

24          Going back to what Mr. Ames said, this is in fact not

25    a new issue.  This is not a new wrinkle.  I did explain the

1   (s)(2)(B) and their obligation to what would be in the purchase

2   agreement that would clarify all of that.

3          THE COURT:  Well let me ask you this, Ms. Hinkle.  How

4   does it relate?  How is the overall purchase agreement going to

5   shed any light on this investigation duty that they have once

6   you dispute a debt?

7          MS. HINKLE:  Okay.  Let me explain that.  Under the

8   (s)(2)(B) it is only about that.  It only refers to the

9   investigation done after a dispute.  Now when they gave me the

10  bills of sale and it says without recourse or warranty then they

11  gave me a piece of paper printed up with the information that

12  they say they got from the other buyers.  First of all, those

13  documents show that the sale amount was the full amount of the

14  debt, which obviously is incorrect.  They couldn't make any

15  money if that is what they were doing.  But I really don't care

16  what they paid for it.  I don't need to see the amounts that

17  they paid.  What is important is the terms of the sale as far as

18  Midland's expectation to be able to go back to the seller to

19  verify the existence of any account.  I am not disputing that

20  they bought this information from these other sellers.  I am

21  disputing that the original accounts ever existed so that is

22  where you have to start.  They say they didn't do anything but

23  go back to the sellers to reinvestigate.  If the language in the

24  purchase agreement clearly states that they don't have anything

25  else, they can't provide anything else, there is nothing else to

1   be had and they knew that in advance, then going back to the

2   seller and presenting that that satisfies the requirement under

3   the (s)(2)(B) section of the FCRA is just not true.

4           THE COURT:  Well, I don't know.  You had me there for

5   a minute and I was going along with you and then I started

6   thinking well let's just say for a minute the contract says what

7   you think which is that there is no right of recourse and we

8   have given you all there is to have with respect to confirmation

9   that each of these accounts exist that you are buying then the

10  next question is, well, what else can Midland do, right?  But I

11  get your overall point.

12          Mr. Ames, it sounds like she has a pretty good point

13  there that the purchase agreement would have to include some

14  language regarding verification of these accounts and perhaps

15  even what happens when someone disputes a debt.

16          MR. AMES:  I have not seen the particular account

17  purchase agreement that she references in her email so I could

18  only speculate as to what it says.  I know generally that it

19  includes the overarching commercial terms of the sale and does

20  not identify or mention any accounts specifically.  I guess

21  where we get tripped up is it seems pretty settled under Georgia

22  law that to constitute a valid assignment it has to be writing

23  and it has to clearly identify the assignor and the assignee,

24  and we've got both of those elements here with the bill of sale.

25  The irony of this is if we had done it the exact opposite way,

1   if we had produced only the account purchase agreement and not

2   the bill of sale then there might be room for an argument that

3   we haven't reasonably identified her debt or connected the dots

4   that in any way show standing on our part to speak to collect

5   but in this instance we have been precise and we have produced a

6   bill of sale that satisfies Georgia law for an assignment of a

7   chosen action and we, again, admit that any overarching

8   commercial terms just don't bear on any investigation that we

9   did or didn't do marked after the fact.

10         THE COURT:  But surely it may affect it.  It depends

11  on what the agreement says it may.  I can see where there is an

12  argument of relevance here and it sounds like you are not

13  familiar enough with those general terms and conditions to be

14  able to really categorically say whether they are responsive or

15  not.  So I would err on the side of Ms. Hinkle on this and think

16  that instead of just giving her an exhibit to the sale that

17  talks specifically about her that the overall contract is

18  arguably relevant but certainly to the extent that it needs to

19  be redacted to protect trade secrets and the like I want you to

20  have the protection of being able to do that and the protection

21  of a protective order as well, and if Ms. Hinkle won't consent

22  to one, just file with the Court a draft and I will be glad to

23  sign it as long as it is like most of the ones we see around

24  here.

25         MS. HINKLE:  I offered to do that, Your Honor.  And as

1   I said before, I have no problem with them redacting out things

2   like amounts, agreements to buy.  A forward flow usually means

3   that they are agreeing to buy more accounts later on down the

4   road with the same entity as opposed to an accounts purchase

5   agreement.  It may be one or both between the two accounts.  I

6   have no argument that they bought to assign to them a debt that

7   belonged to somebody.  My argument is it doesn't belong to me

8   and the language is going to be in that agreement as to what

9   their reasonable expectation of proving it did would have been.

10  That is what would be in that agreement so I am perfectly

11  amenable to a specific protective order in regard to this.  I

12  would ask, however, that you instruct them not to redact any of

13  the language in regard to what was included in the sale as far

14  as warranty, documentation, where they got it from, for

15  instance, because I know --

16          THE COURT:  Ms. Hinkle, I think you are getting a

17  little ahead of yourself.  You are not dealing with some

18  Johnny-come-lately lawyer here.  Mr. Ames is highly regarded, he

19  certainly has a lot of experience, and you are starting to talk

20  about a dispute that doesn't even exist.  I mean, I think he

21  understands that the general terms and conditions are ones that

22  you are going to want to see.  Those are the ones that you

23  allege to be relevant so let's not get into that right now.

24          MS. HINKLE:  All right.

25          THE COURT:  I will say overall, Ms. Hinkle, I do think

1   that sometimes you approach these topics with this feeling like

2   you are dealing with shysters on the other side or perhaps

3   litigators who don't know what they're doing.  I don't think

4   that has been the case with either lawyer you dealt with so I

5   think that you need to probably show them a little more respect

6   and professionalism.  Certainly when I litigated I made every

7   effort to do that with my opposing counsel and I only accused

8   them of not being forthcoming when I had direct evidence of that

9   being the case.  It is just what we do within the bar and I will

10  expect you to do the same thing for them.

11          MS. HINKLE:  All right.

12          THE COURT:  All right.  So we need to move on and talk

13  about the timing of all this.

14          Ms. Hinkle, is there any outstanding discovery that

15  you are going to want to conduct once you get this redacted

16  protected full agreement in hand?

17          MS. HINKLE:  Just one.  I would request the

18  opportunity to depose the person who signed the affidavit that

19  was put in yesterday.  I don't know if you got a chance to read

20  it but it doesn't pertain to me at all.  It is all about the

21  Defendant's debt throughout the whole thing.

22          THE COURT:  Ms. Hinkle, how in the world does that

23  affidavit not relate to you?

24          MS. HINKLE:  The language in it all refers to the

25  Defendant's debt, the Defendant's account.  I am the Plaintiff.

1           THE COURT:  Hold on a second.

2           Well I think that is probably a typo; is that right,

3  Mr. Ames?

4           MR. AMES:  It is.

5           THE COURT:  I think it is a fair inference that that

6  is a typo.  I understand you want to take his deposition.  I

7  think I would probably want to do the same so if you want to do

8  that and maybe take one other deposition of the Defendants if

9  that is all we are talking about, how much time do you think you

10  need to do that, Ms. Hinkle?

11          MS. HINKLE:  Just long enough for me to - I will have

12  to do it in written deposition so just long enough for me to

13  serve that on them and for them to reply.

14          THE COURT:  You don't want to do that in a regular

15  deposition?  Written depositions to me are just terribly

16  inefficient and time consuming and you can't do follow-up.  I

17  would not recommend that.

18          MS. HINKLE:  My reason for that is that I am

19  financially unable to do it any other way.

20          THE COURT:  All right.  You know what; I so don't like

21  depositions in written requests.  I have only seen them in a

22  couple of instances since I have been on the bench.  I didn't

23  see them at all in my practice because we avoided them like the

24  plague.  I am not familiar with the timing mechanisms of that.

25          Mr. Ames, are you familiar enough with the timing

1  mechanisms to know what kind of time that means we need to give

2  for that?

3          MR. AMES:  No, Your Honor.  I am scurrying for my rule

4  book now and if you have encountered this once or twice that is

5  one or two times more than I have over 15 years.  I am aware

6  that it is out there but I have never seen it done.

7          THE COURT:  All right.  Let's see.

8          MS. HINKLE:  I should think just like other forms of

9  discovery would it not require 30 days to give them to answer?

10         THE COURT:  Like most things in the law I am pretty

11  good at speculating and half the time I am right but the other

12  half I am not so I have to take a look at the rule to see.

13 (BRIEF PAUSE)

14         MR. AMES:  It looks like the general rule is under

15  Federal Rule 31.  I am reading very quickly.  I am not seeing

16  anything that directly speaks to a time limit but it might be

17  because I am reading quickly, and I am looking to see if there

18  is a local rule also.

19 (BRIEF PAUSE)

20         MR. AMES:  There doesn't appear to be a local rule

21  that addresses it so it is just the federal rule.

22         THE COURT:  Hold on.  Let me read this real fast.

23 Sorry.

24         MR. AMES:  Sure.

25 (BRIEF PAUSE)

1      THE COURT:  Well there is a procedure in 31.5 for

2   cross-examination questions and redirect questions but, Mr.

3   Ames, I doubt you would want to submit any written cross-

4   examination questions, right?

5      MR. AMES:  That's right.

6   (BRIEF PAUSE)

7      THE COURT:  All right.  How quickly, Mr. Ames, do you

8   think we can get that protective order together and produce that

9   agreement?

10      MR. AMES:  We will have a proposed protective order to

11   Ms. Hinkle by no later than close of business Friday and

12   hopefully sooner than then.  I will need to get the agreement

13   from my client and start reviewing it immediately and then upon

14   entry of the protective order we will produce the document.  I

15   don't want to promise to produce anything tomorrow without

16   talking to my clients.

17      THE COURT:  Sure.

18      MR. AMES:  Inside of, say, 7 days should be do-able.

19      THE COURT:  Well let me ask you this, Mr. Ames.  Is

20   there any additional discovery that you are going to want to

21   conduct?

22      MR. AMES:  No, sir.  We are eager to proceed on to the

23   next stage of the case.

24      THE COURT:  Okay.  Well, Ms. Hinkle, if I give you 45

25   days from today's date to complete discovery do you think that

1  will be sufficient?

2          MS. HINKLE:  Yes, sir.  I would like to point out

3  there are two of those agreements; they are different companies.

4          THE COURT:  I think that is understood.

5          Now I want you to understand that there were lots of

6  accounts that would have been purchased through these two

7  agreements and you're not going to get information regarding

8  other people's accounts, you understand that, right?

9          MS. HINKLE:  No, I don't want that.  I have no

10 interest in that at all.

11         THE COURT:  So are you are just getting the general

12 terms and conditions that go along with the bill of sale?

13         MS. HINKLE:  Yes.

14         THE COURT:  Okay.  All right.

15         So we will enter an order to that effect then that we

16 are going to allow 45 days for the Plaintiff to conduct

17 discovery, that the Defendant doesn't have any additional

18 discovery to conduct, and we will look for that draft protective

19 order to come in.

20         Ms. Hinkle, do you have any objection to Mr. Ames

21 emailing you that draft protective order?

22         MS. HINKLE:  No.  I would appreciate it.

23         THE COURT:  That is just going to move things along a

24 lot faster if you will agree to do that.

25         And do you have a good email address that you can

1   communicate to him now so we are all on the same page about

2   where it goes?

3          MS. HINKLE:  We have been communicating to my only

4   email address.

5          THE COURT:  Oh that is right.  Y'all had some emails

6   in here.  Okay.

7          All right.  Well I think that takes care of everything

8   so we are going to deny in part and grant in part the motion to

9   compel and grant it only with respect to this issue of the

10  agreement.

11         And backing up just for a minute; Mr. Ames, do you

12  have any cases where this has been litigated in the past in a

13  similar context?

14         MR. AMES:  I have asked that question and I am wary of

15  not overstating it.  Midland has cases all over the country and

16  while my folks at our law firm who handle these are unaware of

17  this agreement ever being required to be produced I did not want

18  to overstate it by saying that Midland had never been ordered to

19  produce it because if they have and our firm just wasn't

20  involved or wasn't aware of it I don't want to unintentionally

21  mislead the Court.  But in our experience, it has never been an

22  issue.

23         THE COURT:  And I know I am backing up a little bit

24  here.  But the way I am thinking about this is that agreement

25  somewhere in there probably has some representations and

1   warranties regarding the validity of the debts that are being

2   purchased and/or it may touch on what happens when a debt on one

3   of these accounts is disputed.  What kind of information can be

4   requested and provided.  Am I just totally wrong about that?

5            MR. AMES:  I just don't know, Your Honor.

6            MS. HINKLE:  Your Honor, there is a recent case where

7   Midland was ordered to produce the purchase agreement and that

8   is *Gold versus Midland* out of Northern California.  That order

9   was on February 14th of this year.

10            THE COURT:  Ms. Hinkle, that is excellent.  That is

11   excellent.  Do you have a cite for that?

12            MS. HINKLE:  I can send you the order.  I will send it

13   to your clerk.

14            THE COURT:  And so that would give me a little more

15   comfort if I knew I wasn't the first judge in the country to

16   order production of that type of agreement.  I just makes sense

17   to me that there may be some provisions along those lines in

18   there that would arguably be relevant to the litigation.

19            MS. HINKLE:  I will give you case law on some others

20   as well but that is the latest one.

21            THE COURT:  Okay.  Well make sure you copy Mr. Ames

22   when you send that authority to Mrs. Cirillo.

23            And Mr. Ames, if you have any contra authority that

24   you want to send, you can do it in the same manner.

25            MR. AMES:  Okay.  Well what if we do?  I mean, if we

1  find cases that say it should not be required to be disclosed,

2  the zealous advocate impulses in me are going to want to invite

3  the Court to reconsider the issue and if that is not the signal

4  that you are sending then I certainly don't want to file

5  something that I shouldn't.

6       THE COURT:  I am doing some of this off the cuff,

7  right, and just listening to you guys talk about it and then do

8  what my gut tells me and I am always uncomfortable with that.

9  As I said earlier, my gut is only right about 50 percent of the

10 time or maybe 51 percent, so if you want to instead of emailing

11 Mrs. Cirillo some cites if you are more comfortable submitting a

12 supplemental brief then I will give you through Friday to do

13 that.  Is that enough time?

14      MR. AMES:  Yes, Your Honor.

15      THE COURT:  Okay.  And then from there we will enter a

16 ruling shortly after that and hopefully get this thing back on

17 track.

18      MR. AMES:  We appreciate Your Honor's time and

19 patience.

20      THE COURT:  No, no problem.  Glad to do it.

21      Ms. Hinkle, is there anything further from your

22 perspective we need to talk about today?

23      MS. HINKLE:  I don't believe so.  I thank you very

24 much.

25      THE COURT:  Thank you.

1          Mr. Ames, any further from your perspective?

2          MR. AMES:  Well one small point of clarification.  On

3     the extension of 45 days of additional discovery, is that going

4     to be limited to the serving and responses to the deposition by

5     written question?

6          THE COURT:  No.  In fact, if the Defendant thinks of

7     something else that you believe needs to be done, I am not going

8     to limit you guys at all.  You have 45 days to do whatever else

9     you think you need.  And the 45 days won't run from today.  It

10    will run from whenever we get this order out ruling on these

11    issues.

12         MR. AMES:  Okay.  I was a little more concerned about

13    it going the other way which is that it is an opportunity for

14    another 45 days of open ended questions about produce this

15    agreement and that agreement when I think we have produced

16    everything we could locate that pertains to her specifically but

17    if it is open it's open.  I just want to make sure I understand

18    the Court's ruling.

19         THE COURT:  I think Ms. Hinkle has had enough of this

20    document discovery anyway.  She is ready to get to the

21    deposition and get this over with.

22         MS. HINKLE:  And you are absolutely right.  I really

23    truly do not believe other than the purchasing sale agreements

24    that there is anything that they could give me.

25         THE COURT:  Now, Ms. Hinkle, I do want to tell you

1  that you do have 45 days but you really need to give some

2  serious consideration to whether there are any other depositions

3  you want to take because you are not going to get another bite

4  at this.  This is the last opportunity to conduct discovery in

5  the case.

6        MS. HINKLE:  Absolutely.  I will do that order

7  immediately after this conference and the other case law I need

8  to get out of my records and I will send that to Mrs. Cirillo no

9  later than the morning.

10        THE COURT:  All right.  Well thank you very much,

11  everyone, for your efforts in narrowing this discovery dispute

12  down to a very manageable core of issues.  I wish you guys a

13  good rest of the week.

14        MR. AMES:  Okay.

15        MS. HINKLE:  Thank you very much.

16        MR. AMES:  Thank you, Your Honor.

17        THE COURT:  Goodbye.

18

19        *(PROCEEDING CONCLUDES APPROXIMATELY 3:48 p.m.)*

20        ------------------------------------------------------

21

22

23

24

25

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**CERTIFICATION**

I certify that the foregoing, consisting of pages 1-29, is a true and correct copy of the transcript as transcribed by me to the best of my ability from the official electronic recording of the proceedings.

This the 20th day of May, 2014.

*/s/ C. Joan Mobley*

U.S. District Court Reporter

Southern District of Georgia