## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

| | | |
|---|---|---|
| **TERI LYNN HINKLE,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **V.** | ) | |
| | ) | **CIVIL ACTION NO.** |
| **MIDLAND CREDIT** | ) | 3:13-cv-00033-DHB-BKE |
| **MANAGEMENT, INC., MIDLAND** | ) | |
| **FUNDING, LLC, and ENCORE** | ) | |
| **CAPITAL GROUP, INC.** | ) | |
| | ) | |
| **DEFENDANTS.** | ) | |

### DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW

Pursuant to Federal Rule of Civil Procedure 56 and Local Rules 56 and 56.1 of the Southern District of Georgia, Defendants Midland Credit Management, Inc., Midland Funding, LLC, Encore Capital Group, Inc. (collectively, "Midland") hereby respectfully move this Court for an order granting summary judgment in their favor on the claims asserted by Plaintiff Teri Lynn Hinkle ("Hinkle"). In support of this motion, Midland also submits the following Statement of Undisputed Facts and Memorandum of Law.

### INTRODUCTION

In her First Amended Complaint (Doc. 8), Hinkle claims that Midland violated various provisions of the Fair Debt Collection Practices Act ("FDCPA")

1

by attempting to collect on two accounts that she claims she did not owe.  (*See* Doc. 8, at ¶¶ 90–103) (Count IV).  She claims that Midland also violated various provisions of the Fair Credit Reporting Act ("FCRA") by improperly reporting the same two accounts to consumer reporting agencies ("CRAs").  (*See id.*, at ¶¶ 64–89) (Counts I–III).[1]  The undisputed evidence, however, shows that both claims fail as a matter of law.

In Count IV, Hinkle alleges that Midland is liable under several provisions of the FDCPA for failing to provide her with the statutorily-required validation notices concerning both of the disputed accounts (Doc. 8, at ¶ 92); failing to cease collection activities after she disputed the accounts (*id.* at ¶ 94); harassing her with telephone calls after she disputed the accounts; (*id.* at ¶ 95); and making false representations regarding the accounts to the CRAs (*id.* at ¶¶ 91, 93).  But according to the undisputed evidence, Midland did include the requisite validation notices in its initial communications with Hinkle concerning both accounts. Because Hinkle failed to dispute the accounts in writing within 30 days, as required under the FDCPA's statutory validation procedure, Midland was not obligated to cease its collection activities.  Nor can Midland be liable for making any false representations to the CRAs in connection with the accounts, as the undisputed evidence shows that it appropriately flagged the accounts as "disputed."

---

[1] Plaintiff dismissed Count V of the Amended Complaint.  *See* (Docs. 21, 23).

As for Counts I-III, Hinkle essentially alleges a single claim for purportedly willful violations of the FCRA.[2]  In support of her FCRA claim, Hinkle alleges that Midland obtained her credit report without a permissible purpose (Doc. 8, at ¶¶ 74, 88); reported false information to the CRAs (*id.* ¶¶ 75, 81); and failed to conduct a reasonable investigation after receiving notice from the CRAs that she disputed the two accounts that Midland was attempting to collect (*id.* ¶¶ 75, 81).  It is undisputed, however, that Midland obtained Hinkle's credit report only for the permissible purpose of attempting to collect on her two accounts; the FCRA provides no private right of action for the alleged furnishing of false information to the CRAs; and Hinkle has failed to raise a triable issue of fact regarding the reasonableness of Midland's investigations regarding the disputed accounts.

Accordingly, and for the reasons stated below, Midland is entitled to judgment as a matter of law on both the FDCPA and FCRA claims asserted in Hinkle's First Amended Complaint.

---

[2] In Counts I and II, the same claim is asserted against Midland Credit Management, Inc. and Midland Funding, respectively. In Count III, Plaintiff alleges Encore Capital Group, Inc. is vicariously liable for violations alleged against Midland Credit Management, Inc. and Midland Funding, LLC in Counts I and II.

## STATEMENT OF UNDISPUTED FACTS

On September 24, 2008, Midland acquired from AIS Services, LLC a debt originally owed to GE/Meijer (the "GE/Meijer Account").[3]  On October 1, 2008, Midland sent an initial collection letter to Hinkle regarding the GE/Meijer Account, which included a settlement offer promising that Midland would notify the three major CRAs that the debt was paid in full if it received payment of $237.49 by November 15, 2008.[4]  Twelve days later, Midland received a check in the amount of $237.49—the exact amount of the settlement offer—sent to its secure payment "lock box" at the remittance address identified on the settlement letter.[5]  Thereafter, Midland ceased reporting the GE/Meijer Account to the CRAs as of March 16, 2009, and the account was reported as "paid in full."[6]  On October 20, 2011—over three years after Midland had sent its initial communication to Hinkle regarding the GE/Meijer Account—Hinkle sent a "Demand for Validation of Debt" to Midland, claiming that she did not owe, and never owed, any money on the GE/Meijer Account.[7]

---

[3] *See* Affidavit of Angelique Ross, attached hereto as Exhibit 1, at ¶ 6; *see also* Ex. 1-A to Affidavit of Angelique Ross.

[4] Ex. 1-D.

[5] Ex. 1 at ¶ 8; Ex. 1-C, at Midland-Hinkle 000047 and Midland-Hinkle 000221.

[6] Ex. 1-C, at Midland-Hinkle 000048.

[7] (Doc. 8, at ¶ 17).

Separately, on December 6, 2011, Midland acquired from Debt Recovery Solutions, LLC, a debt originally owed to T-Mobile (the "T-Mobile Account").[8] Midland sent an initial collection letter to Hinkle regarding the T-Mobile Account on December 21, 2011, advising her that Midland would "assume the debt to be valid" if she did not "notify [Midland] within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof."[9]

It was shortly after sending her "Demand for Validation" of the GE/Meijer Account that Hinkle then received Midland's initial communication concerning the T-Mobile Account on December 21, 2011.[10]   On December 28, 2011, Midland called Hinkle at her home in an attempt to reach a settlement of the T-Mobile Account.[11]   During that conversation, however, Hinkle verbally disputed that she owed any money on the T-Mobile Account.[12]

Upon receiving notice of Hinkle's dispute of the T-Mobile Account, Midland sent her letters dated February 5, 2012, and July 21, 2012, seeking her assistance "so that we may reach a quick resolution of your dispute."[13]   Each letter

---

[8] Ex. 1, at ¶ 7; *see also* Ex. 1-B.

[9] Ex. 1-F.

[10] (Doc. 8, at ¶ 19); *see also* Ex. 1-F.

[11] (Doc. 8, at ¶ 20); *see also* Ex. 1-E, at Midland-Hinkle 00035.

[12] (Doc. 8, at ¶ 20); *see also* Ex. 1-E, at Midland-Hinkle 00035.

[13] Exs. 1-G, and 1-H.

also stated that as part of Midland's "investigation of your dispute, it would be helpful to have a copy of any documentation you may have that supports your dispute," and provided four examples of supporting documentation.[14] Hinkle, however, never provided any documentation to substantiate her dispute of the T-Mobile Account.[15]  Instead, Hinkle intentionally refused to respond to Midland's request for assistance in investigating her dispute, later testifying that she "understood [the letters] to be [Midland] shifting the burden back on me and I'm not obligated under law to do that [investigation] for them."[16]

Having received no response to its February 5 letter requesting Hinkle's assistance in investigating her dispute of the T-Mobile Account, Midland obtained a copy of her credit report on May 7, 2012.[17]  After Hinkle received Midland's second letter requesting documentation regarding her dispute on July 21, Hinkle mailed to Midland a "Notice of Intent to Sue" and a "Demand for Validation of Debt" regarding the T-Mobile Account on July 26, 2012—over seven (7) months after Midland sent her its initial communication concerning the T-Mobile Account.[18]  When Midland failed to pay the $18,000 settlement as demanded in her

---

[14] Exs. 1-G, and 1-H.

[15] Ex. 1-E.

[16] *See* Transcript of March 11, 2014 Deposition of Teri L. Hinkle at 106:15–23.  A true and correct copy of the referenced transcript is attached hereto as Exhibit 2.

[17] (Doc. 8, at ¶ 25).

[18] (*See* Doc. 8, at, at ¶ 31–32); Ex. 1-I, at Midland-Hinkle 000028.

July 26 "Notice of Intent to Sue,"[19] Hinkle filed suit, alleging that Midland had violated the FDCPA and the FCRA by attempting to collect the Accounts and by falsely reporting the Accounts to the credit reporting agencies.

## ARGUMENT AND CITATION OF AUTHORITY

Midland is entitled to judgment as a matter of law on both Hinkle's FDCPA and FCRA claims.  First, to the extent Hinkle's FDCPA claim is based on any of her allegations concerning the GE/Meijer Account, that claim is barred by the one-year statute of limitations under the FDCPA.  As for Hinkle's claims regarding the T-Mobile Account, they likewise fail as a matter of law.  Contrary to her unsupported allegations, the undisputed evidence demonstrates that Midland did in fact include the requisite validation notice in its initial communication with Hinkle concerning the T-Mobile Account.  Because she failed to dispute the accounts in writing within 30 days, as required under the FDCPA's statutory validation procedure, Midland was not obligated to cease its collection activities. Furthermore, the undisputed evidence also shows Midland appropriately flagged the accounts as "disputed" in its communications with the CRAs, thereby satisfying its obligations under the FDCPA.

Midland is also entitled to summary judgment on Hinkle's FCRA claims; (1) as it is undisputed that Midland obtained Hinkle's credit report only for the

---

[19] Ex. 1-I, at Midland-Hinkle 000023.

permissible purpose of its attempt to collect on the Accounts; (2) the FCRA provides no private right of action for the alleged furnishing of false information to the CRAs; and (3) Hinkle has put forth no evidence whatsoever regarding the alleged unreasonableness of Midland's investigations regarding her dispute of the T-Mobile Account.

## I. Hinkle's FDCPA claim (Count IV) is time-barred to the extent it is based on her allegations concerning the GE/Meijer Account.

Claims under the FDCPA must be brought "within one year from the date on which the violation occurs."  15 U.S.C. § 1692k(d).  Yet it is undisputed that the GE/Meijer Account was paid in full as of December 2008.[20]  Consequently, any FDCPA claim based on the GE/Meijer Account is clearly time-barred.

## II. Hinkle's FDCPA claim (Count IV) fails as a matter of law because the undisputed evidence shows that Midland was not required to cease collection activities in response to Hinkle's oral dispute of the T-Mobile Account.

Hinkle claims in Count IV that Midland:

(1)   failed to provide her with the statutorily-required validation notices concerning both Debts[21] in violation of § 1692g(a) (Doc. 8, at ¶ 92);

---

[20] Ex. 1-C, at Midland-Hinkle 000047.

[21] Although Midland's initial communication to Hinkle regarding the GE/Meijer Debt plainly included the validation notice required under § 1692g(a) (*see* Ex. 1-D), as noted above, any FDCPA claim with respect to that debt is time-barred under the FDCPA's one-year statute of limitations.  *See Narog v. Certegy Check Servs., Inc.*, 759 F. Supp. 2d 1189, 1193 (N.D. Cal. 2011) ("A plaintiff cannot allege a claim for violation of the FDCPA based on conduct that occurred after he paid his debt in full, and after the debt collector acknowledged that the debt was paid in full.  Under the FDCPA, that conduct is not taken in connection with the collection of a debt.") (citing *Winter v. I.C. System Inc.,* 543 F.Supp.2d 1210, 1213 (S.D. Cal. 2008)).

(2)   failed to cease collection activities in response to her oral dispute of the T-Mobile Account in violation of § 1692g(b) (*id.* at ¶ 94);

(3)   harassed her with telephone calls after she disputed the T-Mobile Account in violation of § 1692d(5) (*id.* at ¶ 95); and

(4)   falsely represented the nature of the T-Mobile Account to the credit reporting agencies in violation of § 1692e (*id.* at ¶¶ 91, 93).

Each alleged basis for her FDCPA claim fails as a matter of law, however, and Midland is entitled to summary judgment on Count IV.

While Hinkle claims that Midland violated the FDCPA by failing to provide her with the requisite notice of the procedure for disputing the T-Mobile Account, the undisputed evidence shows otherwise.  Because Hinkle failed to dispute the T-Mobile Account in writing within 30 days, as Midland advised her in its initial communication regarding the T-Mobile Account, it was not required to cease collection activities.

### A.   Midland provided Hinkle with the validation notice required by § 1692g(a).

"[T]he FDCPA sets forth a detailed procedure for disputing the validity of a debt, . . . and upon the making of a request for debt verification, all collection efforts must cease." *Bleich v. Revenue Maximization Grp., Inc.*, 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002) (citing 15 U.S.C. § 1692g(a)).  Here, "there is no question that [Midland's] letter to Plaintiff contained a proper validation notice" apprising Hinkle of the statutory procedure for disputing the debt and requesting verification:

Unless you notify MCM within thirty (30) days after receiving this notice that you dispute the validity of the debt, or any portion thereof, MCM will assume this debt to be valid.

If you notify MCM, in writing, within thirty (30) days after receiving this notice that the debt, or any portion thereof, is disputed, MCM will obtain verification of the debt or a copy of a judgment (if there is a judgment) and MCM will mail you a copy of such verification or judgment.

Ex. 1-F; *Bleich*, 233 F. Supp. 2d at 500. "Where a debt collector has included appropriate language regarding the FDCPA debt validation procedure, the allegation that the debt is invalid, standing alone, cannot form the basis of a lawsuit alleging fraudulent or deceptive practices in connection with the collection of a debt." *Id.* at 501.[22] Accordingly, Midland is entitled to judgment as a matter of law on Hinkle's FDCPA claim to the extent it is based on the allegation that Midland violated § 1692g(a) by "fail[ing] . . . to provide the required 'Thirty Day Validation Notice' or disclosures to Plaintiff." (*See* Doc. 8, at ¶ 92).

**B.    Hinkle failed to dispute the debt in writing within 30 days, and so Midland was not required under § 1692g(b) to cease collection activities.**

"There is also no question that Plaintiff chose to ignore the debt validation procedure" noted in Midland's initial communication to Hinkle on December 21,

---

[22] Indeed, "[t]o allow such lawsuits would discourage use of the detailed statutory procedure" under the FDCPA, which provides the consumer with an opportunity to dispute the debt, and a debt collector the chance to verify it. *Bleich*, 233 F. Supp. 2d at 501. If the law were otherwise, consumers such as Hinkle "would be encouraged to resort to litigation (and the prospect of an attorney's fee award) instead of being encouraged to communicate directly with the debt collector to expeditiously resolve their claim." *Id.* Thus, one "can only wonder why the plaintiff has chosen to impose the significant burden of litigation on both the defendant[s] and this court, instead of simply following [the] cost-effective procedures provided by the FDCPA specifically designed to facilitate the exchange of information between debt collectors and debtors." *Id.* (quoting *Lindbergh v. Transworld Systems, Inc.*, 846 F. Supp. 175, 179 (D. Conn. 1994)).

2011. *Bleich*, 233 F. Supp. at 500. Under § 1692g(b), "[i]f the consumer notifies the debt collector **in writing** within the thirty-day period described in subsection (a) of this section that the debt, or any portion thereof, is disputed, . . . the debt collector shall cease collection of the debt, or any disputed portion thereof, until the debt collector obtains verification of the debt." 15 U.S.C. § 1692g(b) (emphasis added). Here, it is undisputed that while Hinkle orally disputed the T-Mobile Account on December 28, 2011,[23] she did not dispute the debt in writing until July 26, 2012, when she mailed Midland a package entitled "Notice of Intent to Sue."[24] But "[a]n oral notice of dispute of a debt's validity has different legal consequences than a written notice." *Osborn v. Ekpsz, LLC*, 821 F. Supp. 2d 859,

---

[23] *See* (Doc. 8, at, at ¶ 20); Ex. 1-E, at Midland-Hinkle 00035 ("Verbal Dispute within 45 days" recorded on "12/28/2011").

[24] *See* (Doc. 8, at, at ¶ 31–32) ("On July 27, 2012 Hinkle sent a second Demand for Validation letter to MCM and Midland via USPS Certified mail."). While Hinkle's First Amended Complaint (Doc. 8, at ¶ 32) refers to her July 27, 2012 "Notice of Intent to Sue" as containing a "second Demand for Validation," the "first" such written demand pertained to the GE/Meijer Debt, for which she wrote requesting validation on October 20, 2011, over two months before Midland's initial communication with Hinkle regarding the T-Mobile Debt. *Compare* (Doc. 8, at ¶ 18) ("On October 20, 2011 Hinkle sent a 'Demand for Validation of Debt' letter by USPS Certified mail to MCM regarding the alleged account it was reporting."), *with* Ex. 1-F ("Midland Funding LLC recently purchased your T-MOBILE account and Midland Credit Management, Inc. ('MCM'), a debt collection company, is the servicer of this obligation.") (dated December 21, 2011), *and* Ex. 1-I, at Midland-Hinkle 000028 ("Pursuant to 15 U.S.C. § 1692 (g) (4) Validation of Debts, if you have evidence to validate your claim . . ., this is a demand that, within 30 days, you provide such verification/validation and supporting evidence . . . .") (dated July 26, 2012).

As such, it remains undisputed that Hinkle did not request in writing that Midland provide validation of the T-Mobile Debt until July 27, 2012, well outside the 30-day validation period that began to run on December 21, 2011, when Midland sent her an initial communication regarding the T-Mobile Debt, which included the validation notice required by § 1692g(a).

869-70 (S.D. Tex. 2011). "[I]f the consumer disputes the debt orally rather than in writing, the consumer loses the protections afforded by § 1692g(b); the debt collector is under no obligation to cease all collection efforts and obtain verification of the debt." *Id.* (citing *Withers v. Eveland,* 988 F. Supp. 942, 947 (E.D. Va. 1997)).[25] Therefore, Midland is also entitled to summary judgment on Count IV to the extent it is based on Hinkle's contention that Midland violated § 1692g(b) by failing to cease collection activities in response to her oral dispute of the T-Mobile Account.

### C. Hinkle has failed to raise a triable issue of fact as to whether Midland's collection calls violated § 1692d.

For the same reason, Hinkle's claim also fails as a matter of law to the extent she contends that Midland violated § 1692d(5) by "harass[ing] her with numerous collection calls" despite "refusing to respond to Hinkle's demand for validation." (Doc. 8, at ¶ 95). Because Hinkle "dispute[d] the debt orally rather than in writing, . . . [Midland] [was] under no obligation to cease all collection efforts and obtain verification of the debt." *Osborn*, 821 F. Supp. at 869–70. While Hinkle primarily contends that her claim under § 1692d(5) is based on Midland's failure to cease

---

[25] *See also Bicking v. Law Offices of Rubenstein & Cogan,* 783 F.Supp.2d 841, 845 (E.D. Va. 2011) ("A debt collector's statutory duty to verify the debt does not arise unless and until the debtor disputes the debt in writing."); *Fasten v. Zager,* 49 F.Supp.2d 144, 148–49 (E.D.N.Y. 1999) ("Under Section 1692g(a)(4), verification is triggered only by the consumer writing a letter to the debt collector. Here, plaintiff's telephone call to defendant did not constitute such a request for verification.").

collection activities in response to her oral dispute,[26] she also has failed to put forth any evidence sufficient to raise a genuine issue of material fact regarding whether Midland's collection efforts were indeed harassing or abusive in violation of § 1692d.[27]

---

[26] Regarding the basis of her claim under § 1692d(5), Hinkle testified as follows:

Q.     So are you claiming that just calling you about a debt that you failed to pay is harassment?

A.     Again, you are assuming facts not in evidence.  This had nothing to with a debt I failed to pay.  They were calling me after I demanded debt validation.  They did not validate it.  That is a collection action and it's harassment.

Ex. 2, at 78:20–25; 79:1–2.

[27]     Specifically, Midland's records show that Hinkle was only called seven (7) times regarding the T-Mobile Debt.  *See* Ex. 1-E.  Hinkle's testimony was consistent with Midland's records, as she testified only that she was called "about five or six times":

Q.     All right. Now, you also claim telephone harassment under 1692d(5)

. . . .

Q.     How many times did you speak with them on the phone?

A.     I only answered the phone when they called about five or six times.  After that I refused to answer it.

Ex. 2, at 77:13–22.  Thus, Hinkle fails to raise a genuine issue of material fact as to whether Midland violated § 1692d(5) by "[c]ausing a telephone to ring or engaging any person in telephone conversation repeatedly or continuously with intent to annoy, abuse, or harass any person at the called number."  15 U.S.C. § 1692d(5); *see Tucker v. CBE Group, Inc.*, 710 F.Supp.2d 1301 (M.D. Fla. 2010) (granting summary judgment to defendant debt collector, finding that debt collector's 57 calls to plaintiff's home in an attempt to collect a debt from his adult daughter did not violate § 1692d(5) where defendant made no more than seven calls in a single day, and did not call back the same day after leaving a message); *Arteaga v. Asset Acceptance, LLC*, 733 F. Supp. 2d 1218, 1229 (E.D. Cal. 2010) (finding that "[debt collector's] conduct did not rise to the level of harassment under Section 1692d, and [plaintiff] fail[ed] to raise a triable issue of fact as to whether the phone calls were initiated with the intent to harass in violation of Section 1692d(5)" where the plaintiff "present[ed] no evidence that [debt collector] called her immediately after she hung up, called multiple times in a single day, called her place of employment, family, or friends, called at odd hours, or called after she requested Asset to cease calling").

**D.    Midland made no false representations in violation of § 1692e because it properly flagged Hinkle's account as disputed in its communications with the CRAs.**

"In any event, the final, fatal blow to all of Plaintiff's arguments is the fact that Defendant in no way falsely represented the legal status of the debt." *Poulin v. The Thomas Agency*, 760 F. Supp. 2d 151, 161 (D. Me. 2011).  The remainder of Hinkle's FDCPA claim is premised on her allegations that Midland violated § 1692e(2) by "ma[king] a false representation to the three Consumer Reporting Agencies . . . as to the character, amount, or legal status of an alleged debt" (Doc. 8, at ¶ 93), and that Midland violated § 1692e(8) "by reporting an 'alleged' debt' . . . to a consumer reporting agency . . . in connection with the collection of a debt which they knew was incorrect" (Doc. 8, at ¶ 91).  However, "the FDCPA specifically contemplates the circumstances presented here, and obligates only that a debt collector must 'communicate' the disputed nature of the debt" in order to satisfy its obligations to adequately inform credit reporting agencies about the debt. *Poulin*, 760 F. Supp. 2d at 161 (citing *Wilhelm v. Credico, Inc.,* 519 F.3d 416, 418 (8th Cir. 2008) ("[I]f a debt collector *elects* to communicate 'credit information' about a consumer, it must not omit a piece of information that is always material, namely, that the consumer has disputed a particular debt.")).

Nevertheless, "Plaintiff insists that because Defendant was informed that the debt alleged . . . was invalid, its decision to 'credit report' this debt amounted to a

violation of various provisions of Section 1692e, which prohibits the false representation of the legal status of the debt and communicating information known to be false." *Id.* "While Plaintiff may wish this to be a true statement of the law, [s]he unfortunately can cite to no legal authority to support [t]his argument." *Id.* Midland was not required to cease reporting the debt to the credit reporting agencies simply because Hinkle disputed that the debt was ever owed. "In fact, numerous courts have held . . . that the FDCPA does not require a debt collector to independently investigate the merit of the debt . . .[,] and [t]his remains true even when the consumer has specifically challenged whether the amount alleged is due at all." *Poulin*, 760 F. Supp. 2d at 161 citations omitted). Thus, "[t]he Act in no way gives consumers some sort of veto power over collection agencies." *Poulin*, 760 F. Supp. 2d at 161. Because "[t]he evidence before the Court firmly establishes that, in reporting the debt to the credit reporting agencies, [Midland] specifically flagged the debt as disputed,"[28] Midland is entitled to judgment as a matter of law on Count IV. *Poulin*, 760 F. Supp. 2d at 161.

---

[28] Ex. 1-G ("[W]e have requested that the three major consumer credit reporting agencies change the status of this account to 'Disputed.'"); Ex. 1-H (same).

### III. Midland is entitled to summary judgment on Hinkle's FCRA claims (Counts I-III) because the undisputed evidence shows that it obtained her credit report for the permissible purpose of collection and that its investigation was not willfully unreasonable.

In Counts I and II, Plaintiff alleges violations of the FCRA by MCM and Midland Funding, respectively.[29] Both counts are based on the same alleged conduct, namely that:

(1) Midland "obtain[ed] the consumer credit report of Hinkle with no permissible purpose" (Doc. 8, at ¶¶ 74, 88);

(2) Midland "willfully and knowingly report[ed] information . . . which it knew was false and inaccurate" to the CRAs (*id.* ¶¶ 75, 81); and

(3) Midland failed to conduct a reasonable investigation under 15 U.S.C. § 1681s-2(b) (*id.* ¶¶ 75, 81).

Both counts fail because:

(1) Obtaining a credit report for purposes of collection of an account is a permissible purpose under the FCRA, *see* 15 U.S.C. § 1681b(a)(3)(A);

(2) The FDCPA does not provide a private right of action for the mere inaccurate reporting of information; and

(3) While the FDCPA does provide a right of action for the failure to conduct a reasonable investigation of a dispute, the undisputed facts here demonstrate that Midland's investigation was reasonable.

### A. Midland obtained Hinkle's credit report in connection with its attempted collection of the Accounts, which is a permissible purpose under the FCRA.

The FCRA expressly provides that "[a] credit report may be provided 'in connection with a credit transaction involving the consumer on whom the

---

[29] In Count III, Plaintiff alleges Defendant Encore Capital Group, Inc. is—somehow—equally responsible for the violations alleged in Counts I and II.

information is to be furnished and involving the review or **collection** of an account of the consumer.'"   *Flores v. I. C. Sys., Inc.*, No. 13-CV-21352, 2014 WL 1379046, at *3 (S.D. Fla. Apr. 8, 2014), *appeal dismissed* (May 13, 2014) (quoting 15 U.S.C. § 1681b(a)(3)(A)) (emphasis added; alterations omitted).   "[T]his provision of [the] FCRA permits a debt collector to request a credit report if it uses the report to review an account."   *Pinson v. Monarch Recovery Mgmt., Inc.,* No. 12-CV-80480, 2013 WL 961308, at *2 (S.D. Fla. Mar. 12, 2013) (citation omitted).

Here, Midland was undisputedly attempting to collect debts from Hinkle. (*See, e.g.*, Doc. 8, at ¶¶ 39) ("MCM, and Midland operate as a debt buying and collection enterprise."); (*id.* ¶ 92) ("Midland . . . in connection with the collection of a debt"); (*id.* ¶ 94) ("MCM and Midland . . . are still engaging in collection actions . . .").   "It is also undisputed that, as the assignee of that account, [Midland] was entitled under the FCRA to obtain plaintiff's credit report from consumer reporting agencies for the permissible purpose of review or collection of the assigned debt."   *Ostrander v. Unifund Corp.*, No. 07-CV-86-JTC, 2008 WL 850329 (W.D.N.Y. Mar. 28, 2008).

Hinkle has offered no evidence whatsoever that Midland obtained her credit report for any purpose other than collection.   "The fact that Plaintiff disputes [her] current obligation to pay . . . does not provide a basis for concluding that

Defendant[s] lacked a permissible purpose in obtaining Plaintiff's credit report." *Holloman v. Smith Debnam Narron Drake Saintssing & Myers, LLP*, No. 1:14CV31, 2014 WL 1225330, at *2 (M.D.N.C. Mar. 25, 2014), *report and recommendation adopted*, 2014 WL 1339976 (M.D.N.C. Apr. 3, 2014).

Therefore, to the extent that Hinkle's FCRA claims are based on her allegations that Midland obtained her credit report for an impermissible purpose, Midland is entitled to summary judgment in its favor.

## B.   The FCRA does not provide a private right of action for inaccurate reporting.

The FCRA codified the "[r]esponsibilities of furnishers of information to consumer reporting agencies"[30] at 15 U.S.C. § 1681s-2.  Subsection 1681s-2(a) requires that furnishers provide CRAs with "accurate information," while subsection 1681s-2(b) imposes certain obligations upon a furnisher once it receives notice of a dispute from a CRA.  *See New v. CitiFinancial Auto Credit, Inc.*, No. 1:10-CV-905-WKW, 2012 WL 2415532, at *3 (M.D. Ala. June 26, 2012).

The FCRA expressly excludes from the Act's civil enforcement provisions, 15 U.S.C. §§ 1681n & 1681o, "any violation of – subsection (a) of [§ 1681s-2], including any regulations issued thereunder."  *See* 15 U.S.C. § 1681s-2(c)(1).

---

[30] "Furnishers" include "an[y] entity . . . which transmits information concerning a particular debt owed by a particular consumer to consumer reporting agencies."  *Carney v. Experian Info. Solutions, Inc.*, 57 F. Supp. 2d 496, 501 (W.D. Tenn. 1999).  Although Midland disputes that it provided any information to a credit bureau, accepting Plaintiff's allegations as true for purposes of this motion, Midland would be a furnisher of information.

Rather, the enforcement of § 1681s-2(a) is vested solely with state and federal regulators. *See* 15 U.S.C. § 1681s-2(d) ("The provisions of law described in paragraphs (1) through (3) of subsection (c) of this section . . . shall be enforced exclusively . . . by the Federal agencies and officials and the State officials identified in section 1681s of this title.").

Thus, the Eleventh Circuit has recognized that no private cause of action exists under § 1681s-2(a) for reporting false information:

> Green contends that Citizens Bank of Rhode Island ("Citizens") violated § 1681s–2(a) by tendering false information regarding his account. The FCRA, however, does not provide a private right of action to redress such a violation, and the district court was correct in so holding.

*Green v. RBS Nat. Bank*, 288 F. App'x 641, 642 (11th Cir. 2008); *see also New v. CitiFinancial Auto Credit, Inc.*, 2012 WL 2415532, at *3 ("The FCRA does not provide a private right of action to redress a furnisher of information's violation of its duty under § 1681s–2(a)."); *Bishop v. Holloway Credit Solutions, LLC*, No. 3:08-CV-995-TFM, 2009 WL 499390, at *4 (M.D. Ala. Feb. 27, 2009) ("The obligations included in § 1681s-2(a) do not give rise to a private cause of action."); *Knudson v. Wachovia Bank*, 513 F. Supp. 2d 1255, 1260-61 (M.D. Ala. 2007) ("There is no private right of action for violations of § 1681 s–2(a).") (citing *Yelder v. Credit Bureau of Montgomery*, 131 F. Supp. 2d 1275, 1283 (M.D. Ala.2001)).

Therefore, to the extent Plaintiff's FCRA claims are based upon furnishing inaccurate information to the CRAs, those counts must be dismissed because Congress did not provide consumers with a private right of action under the FCRA for the alleged furnishing of false or inaccurate information.

### C. Midland's investigation was reasonable given the information available, and Hinkle refused to provide additional information requested.

On the other hand, Congress did provide private rights of action for violations of § 1681s-2(b), which requires furnishers to perform a reasonable investigation after receiving notice of a dispute from a CRA. In Counts I and II, Hinkle seeks to hold Midland liable for willful violations of the FCRA based on her allegations that Midland failed to conduct a reasonable investigation after receiving notice from the CRAs that the Accounts were disputed.

The undisputed facts simply cannot support a claim for willfulness, however, because "there is an absence of evidence to support" that MCM "consciously disregarded" the law. *Riley*, 194 F. Supp. 2d at 1243. Plaintiff must meet a high standard to survive summary judgment on a claim of willful violation of the FCRA:

> While the Eleventh Circuit has not specifically addressed the meaning of "willful" under the FCRA, the Ninth Circuit has held that "as used in the FCRA, 'willfully' entails a 'conscious disregard' of the law, which means 'either knowing that policy [or action] to be in contravention of the rights possessed by consumers pursuant to the

> FCRA or in reckless disregard of whether the policy [or action] contravened those rights.'"

*King v. Asset Acceptance, LLC*, 452 F. Supp. 2d 1272, 1279 (N.D. Ga. 2006) (granting summary judgment on plaintiff's claim for willful violation of the FCRA) (citation omitted).   In other words, "[t]o be found in willful noncompliance, a defendant must have 'knowingly and intentionally committed an act in conscious disregard for the rights of others.'"  *Stevenson v. TRW, Inc.*, 987 F.2d 288, 293 (5th Cir. 1993) (quoting *Pinner v. Schmidt*, 805 F.2d 1258, 1263 (5th Cir. 1986) (describing cases finding willfulness where reports were "rife with innuendo, misstatement, and slander" or "contained statements about the plaintiff regarding her excessive drinking"), *cert. denied*, 483 U.S. 1022 (1987)); *see also Heupel v. Trans Union LLC*, 193 F. Supp. 2d 1234, 1241 (N.D. Ala. 2002) (granting summary judgment for defendant; "Courts have consistently disallowed punitive damages absent special and aggravating circumstances.").

Under this standard, "the failure to delete erroneous information after receipt of notice by the consumer and even the reinsertion of incorrect information after it had previously been deleted have been found to fall short of the knowing and intentional disregard standard."  *Reed*, 321 F. Supp. 2d at 1116; *Thomas v. Gulf Coast Credit Servs., Inc.*, 214 F. Supp. 2d 1228, 1238 (M.D. Ala. 2002) (granting summary judgment on willfulness claim because "fail[ure] to produce immediate eradication of inaccurate information" is not a knowing and conscious disregard

for the plaintiff's rights).  Rather, the evidence must show an "intention to thwart consciously [plaintiff's] right to have inaccurate information removed promptly from his report."  *King*, 452 F. Supp. 2d at 1280 (citing *Stevenson*, 987 F.2d at 294.

The determinative question for liability is whether the furnisher of information "could have discovered an error in a particular report through a reasonable investigation."  *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991); *see also Chiang v. Verizon New England Inc.*, 595 F.3d 26, 29–30 (1st Cir. 2010) (same).  Here, however, Hinkle relies on nothing more than her contention that the furnished information was inaccurate.  But "[a]n FCRA plaintiff 'cannot rest on a showing of mere inaccuracy, shifting to the defendant the burden of proof on the reasonableness of procedures for ensuring accuracy.'"  *Podell v. Citicorp Diners Club*, 914 F. Supp. 1025, 1032 (S.D.N.Y. 1996) (quoting *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C. Cir. 1984)).  Rather, it is Plaintiff's burden to prove that MCM acted unreasonably under the circumstances.  *Id.*  Yet Plaintiff has introduced absolutely no evidence regarding the applicable standard of care or the reasonableness of Midland's investigation under the circumstances.  In fact, Hinkle has steadfastly refused to offer any evidence at all regarding the unreasonableness of Midland's investigation,

apparently laboring under the mistaken view that the burden is on Midland to show that its investigation was reasonable.[31]

In any event, the undisputed evidence shows that Midland acted reasonably under the circumstances, yet Plaintiff failed to substantiate her dispute.  In July and August 2012, Midland received notice from two of the CRAs, Equifax and Experian, that Plaintiff disputed that the T-Mobile account was hers.[32]  Through its electronic systems, Midland verified that it was reporting the information it received about the account when it was purchased.[33]  As a matter of law, Midland was entitled to rely on the information it received from the original creditor, and

---

[31] For example, when she was asked about Midland's letter of July 21, 2012 (Midland-Hinkle 00078), wherein Midland requested "copies of any documentation you may have that supports your dispute," Hinkle testified as follows:

Q. And it reads in part: The purpose of this letter is to request your assistance so that we may reach a quick resolution to your dispute. So it looks like they were asking you for documentation regarding your dispute. Is that what you understood it to be?

A. I understood it to be them shifting the burden back on me and I'm not obligated under law to do that for them.

Ex. 2, at 106:15–23.  Hinkle likewise admitted that she lacked any evidence regarding the reasonableness of Midland's investigation of her dispute:

Q. But you don't know exactly what steps were taken in conducting any alleged investigation; is that correct?

A. They haven't disclosed that as yet, no. I was not there.

Ex. 2, at 76:16–20.

[32] Ex. 1, at ¶ 15.

[33] *Id.*

"[t]his remains true even when the consumer has specifically challenged whether the amount alleged is due at all." *Poulin*, 760 F. Supp. 2d at 161.[34]  Moreover, Midland requested information or documentation from Plaintiff during its investigation of her disputes, but Plaintiff declined to provide anything.[35]

Without receiving any documentation suggesting that the information Midland received from the original creditors was inaccurate, Midland could not have "**consciously** disregarded" Hinkle's rights under the law.  *See Thomas*, 214 F. Supp. 2d at 1238 ("[F]ail[ure] to produce immediate eradication of inaccurate information" is not a knowing and conscious disregard for the plaintiff's rights). Consequently, MCM is entitled to summary judgment on Hinkle's claim for willful violations of the FCRA.

## CONCLUSION

For the reasons stated above, Midland is entitled to judgment as a matter of law on all of the claims asserted in Hinkle's First Amended Complaint. Accordingly, Midland respectfully requests that this Court enter summary judgment in its favor on all counts.

---

[34] *See also Clark v. Capital Credit & Collection Services, Inc.*, 460 F.3d 1162, 1174 (9th Cir. 2006) ("Within reasonable limits, [Defendants] were entitled to rely on their client's statements to verify the debt."); *Bleich v. Revenue Maximization Grp., Inc.*, 233 F. Supp. 2d 496, 500 (E.D.N.Y. 2002); *Ducrest v. Alco Collections, Inc.*, 931 F. Supp. 459, 462 (M.D. La. 1996).

[35] Ex. 1-G; Ex. 1-H.

Respectfully submitted this the 28th day of July, 2014.

/s/ Matthew B. Ames
Matthew B. Ames
Georgia Bar No. 015898
Joshua M. Moore
Georgia Bar No. 520030
30 Ivan Allen Jr. Blvd. NW, Suite 700
Atlanta, Georgia  30308
Telephone:  (404) 261-6020

**Attorneys for Midland Funding
LLC, Midland Credit Management,
Inc., and Encore Capital Group,
Inc.**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a copy of the foregoing DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND MEMORANDUM OF LAW has been served upon the following by causing a copy of the same to be electronically filed with the Clerk of Court using the CM/ECF system and by United States Mail, properly addressed and postage prepaid, on this 28th day of July, 2014.

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023


*/s/ Matthew B. Ames*
Matthew B. Ames
Georgia Bar No. 015898