FILED
U.S. DISTRICT COURT
AUGUSTA DIV.

2014 SEP -8 AM 9: 46

CLERK _____
SO. DIST. OF GA.

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF GEORGIA
## DUBLIN DIVISION

Teri Lynn Hinkle     )
   *Plaintiff*,     )
           )   **Case No. 3:13-CV-00033**
           )
**vs**          )
           )
**MIDLAND CREDIT**    )
**MANAGEMENT INC.**   )
**MIDLAND FUNDING, LLC.** )
**ENCORE CAPITAL GROUP INC.** )
   *Defendants*.    )
           )

# SEALED AND IMPOUNDED

## PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF THIS COURT:

The Plaintiff asks the Court to deny Defendants' motion for summary judgment and states the following:

### A.  Introduction

1.  On June 27, 2013 Plaintiff, Teri Lynn Hinkle filed her First Amended Complaint and sued the Defendants for violations of the FCRA, 15 U.S.C. § 1681*et al*, and the FDCPA 15 U.S.C. § 1692g(a), g(b),d(5) and 1692e. (*See* Doc. 8)

2.  U.S. Marshal's Return of Service were filed for all Defendants on September 27, 2013 (*See* Docs.10-13)

3.  Defendants filed an Answer to the Complaint on October 1, 2013 (*See* Doc. 14)

4.  On July 28, 2014 Defendants filed a Motion for Summary Judgment. (*See* Doc. 85)

5. Summary Judgment is improper in this case because there are genuine issues of material fact on each element of Plaintiff's causes of action for violations of the FDCPA and the FCRA.

## STATEMENT OF FACTS

6. Plaintiff raised the issue several times in pleadings and noticed the Defendants by USPS Certified Mail, of their failure to comply with FRCP by not providing the Plaintiff with the required 26(a)(1) Initial Disclosures. They to date, have yet to provide those disclosures to the Plaintiff.

7. Defendants agreed to a deadline of November 11, 2013 for the Rule 26(a)(1) disclosures to be made as stated in their Rule 26(f) Report filed with this Court on November 5, 2013 but in fact never submitted the disclosures to the Plaintiff. (*See* Doc. 29)

8. When asked by interrogatory to identify each person known who has knowledge of the facts relevant to this case and to give a brief description thereof for each person they may call as a witness the Defendants objected to the request as overbroad and unduly burdensome etc. but stated without waiving objections the following: (*See* PlainApp., 00062 #3),

   a. "MCM identifies the following: John Moreno, Process Analyst, Midland Credit Management, Inc. Mr. Moreno may be contacted through counsel for MCM. MCM has not identified any individual that it intends to call as an expert witness, but will do so in accordance with the applicable scheduling order in this case."

9. The Defendants have never identified any other person as having any knowledge of facts relevant to this case by 26(a)(1) Disclosures, amended Disclosures, or any other method but instead rely on an affidavit by Angelique Ross in their Motion for Summary Judgment. (*See* Doc. 85 Ex.1)

10. The Defendants state in answers to interrogatories even though the responses were not responsive to the question(s) asked, that no individual person communicated with the

Plaintiff, and that all written communication was "system generated" and not generated by a live person. (*See* PlainApp., 00063 #5)

11. In their interrogatory responses they identify letters only in regard to the second account they allege was owed by the Plaintiff. After stating to the Court, (*See* Doc. 84-2 pg 28 line 12-18), as well as in discovery responses, that they had no more documents responsive to the Plaintiff's discovery requests, they suddenly come up with a letter they claim was sent to the Plaintiff in 2008, the same letter they had purported not to be in possession of when the Plaintiff demanded it in telephone conference with Defendants' Counsel. This is also the letter Defendants claim is the basis for their immunity by time bar on the Plaintiff's FDCPA claims. (*See* Doc 85 pg.4, ¶1) (*See* also Doc. 85 Ex.1-D)

12. Defendants state in their Motion at pg 17 ¶2 and pg 23 ¶1, that they are entitled to rely on records from the original creditor and that they are "assignees" of the original creditor yet they admit they bought the alleged accounts from two other debt buyers and state in responses to interrogatories that they "obtained and relied on the information from the sellers of the unpaid accounts." (*See* PlainApp.at 00066,67 #15)

13. Defendants made two purchases from debt buyers, AIS Services, LLC (AIS), and Debt Recovery Solutions (DRS), on Sept. 24, 2008 and Dec. 6, 2011 respectively. Both purchases were made **"without recourse or warranty"** as stated in the Bills of Sale. (*See* PlainApp., 00009,10)

14. At no time have the Defendants produced either for this Court or to the Plaintiff any documents from, or proof of communications with, any original creditor with whom either alleged debt could have originated.

15. Prior to December 2011 the Plaintiff never received any written communications from the Defendants. (*See* PlainApp.,00001, Affidavit)

16. Prior to December 27, 2011 the Plaintiff never received any telephone calls from the Defendants. (*See* Affidavit, PlainApp., 00001)

17. Prior to May 2011 the Plaintiff was not aware of the existence of Encore Capital Group or its subsidiaries Midland Funding, LLC and Midland Credit Management Inc. (*See* Affidavit, PlainApp., 00001)

18. The Defendants **did not** cease reporting the account allegedly purchased from AIS in 2008 even though they repeatedly state in their motion and it is sworn to in their affidavit that they did. Plaintiff did not become aware of that account until obtaining her credit reports in May 2011. After Plaintiff's dispute with the CRAs on Sept. 6, 2011 the Defendants "verified" with TransUnion and Experian and continued reporting. The Defendants furnished account information to the CRAs continuously from Nov. 17, 2008 to at least the end of Dec. of 2012 as shown on the Plaintiff's credit reports. (*See* Doc 58 Ex. 10a-q)

19. The Defendants' state at pg 4, ¶1 of their motion and in the accompanying document they cite as evidence, Ex. 1-C (000048), of Doc. 85 that they reported the alleged account only up to March 16 of 2009 which is in contradiction to the exhibits in Doc. 58.  Contrary to their affidavit at ¶9 they did not start furnishing the information to the CRAs until after they claim to have received payment in full in Oct. of 2008 (*See* PlainApp 00018)

20. Plaintiff sent a demand for validation of the first alleged account on Oct. 20, 2011 and never received a response regarding that account being disputed. Instead Plaintiff received a letter from the Defendants after Dec. 27, 2011 that was dated Dec. 21, 2011; regarding a different account the Plaintiff had no knowledge of. (*See* Affidavit, PlainApp., 00001)

21. MCM began calling the Plaintiff's home blocking their caller ID on Dec. 27, 2011. The Plaintiff stated to the Midland representative that she had *no accounts* with the company, would not pay them any money, that the call was in violation of the law and that she would sue if they did not cease calling. (*See* PlainApp., 00036)

22. MCM did not cease calling until after the Plaintiff stopped answering and then it began calling one of the Plaintiff's old land line phone numbers according to its own internal records provided in discovery. (*See* PlainApp., 00027,28)

23. The Defendants obtained the Plaintiff's credit reports on May 7, 2012 after the Plaintiff had disputed the first alleged account, had told them verbally she had no account, instructed them to cease harassment and had noticed them by formal validation demand and CRA dispute.

24. The Defendants state they obtained the credit reports with the permissible purpose of attempting to collect on two "accounts" in their Motion for Summary Judgment at pages 3, ¶1 and 16 ¶ III (A).

25. The Plaintiff discovered a second alleged account being reported by Midland Funding, LLC to the CRAs in June 2012 in addition to the first. Plaintiff disputed both accounts with the CRAs on July 13, 2012. Subsequently, MCM deleted the first account from TransUnion and all other entries were updated with the CRAs[1]

26. MCM responded to the Plaintiff's disputes with dunning letters, requests for her to prove the dispute and telephone calls to her home demanding payment. (*See* PlainApp., 00016-31)

27. Nowhere in the data claimed to have been purchased from Debt Recovery Solutions (DRS) for the alleged T-Mobile account is there a cell phone number indicated. The two telephone numbers indicated in the records are the Plaintiff's land line numbers no longer in service at

---

[1] *See* Doc 58 Ex. 10a-q

the time of first communication with the Plaintiff. (*See* Affidavit, PlainApp., 00001 and PlainApp., 00016-31).

## **STANDARD OF REVIEW**

28. Although summary judgment is proper in any case where there is no genuine issue of material fact, this is not a case in which the court should grant summary judgment. See FRCP 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S/Ct/ 2548, 2552 (1986).

29. A defendant who seeks summary judgment on a plaintiff's cause of action must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim or (2) showing there is no evidence to support an essential element of plaintiff's claim. *J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76F.3d 1245, 1251 (1st Cir. 1996); see *Celotex Corp.*, 477 U.S. at 327, 106 S.Ct. at 2555. Only if defendants meet their burden is plaintiff required to respond by summary judgment proof to show a genuine issue of material fact. FRCP 56(e).

30. In determining whether there is a disputed issue of material fact that precludes summary judgment, the court must consider all evidence in the light most favorable to plaintiff as the non-movant. *Garcia v. Pueblo Country Club*, 229 F.3d 1233, 1236-37 (10th Cir. 2002).

## **ARGUMENTS AND AUTHORITIES**

31. For the Defendants to successfully argue for summary judgment they must show that there are no material fact issues as to any elements of the Plaintiff's causes of action. Defendants have made nothing more than conclusory statements regarding the causes of action brought by the Plaintiff, relied on unauthenticated information purchased from other debt buyers,

incomplete records and an untrustworthy affidavit from a person whose identity was not previously disclosed and has not been authenticated.

32. The Defendants state in their motion repeatedly that the Plaintiff's claims fail as a matter of law and that the evidence which they have proffered is undisputed. Plaintiff disputes their evidence, (*See* PlainApp. at 00000), and will show the Defendants have cherry picked information from records shared with the Plaintiff in discovery for the purpose of misleading the Court into rendering an unjust decision. The Defendants owe a duty of candor to the Court.

## *As to 15 U.S.C. § 1692g(a), g(b),d(5) and 1692e:*

33. The Defendants state that the Plaintiff's claims under the FDCPA are barred by statute of limitations based on a letter produced at the eleventh hour in response to Plaintiff's third requests for production, after having sworn not to have any further documents responsive to the Plaintiff's requests. (*Id.* ¶11) No evidence is submitted to show that the letter was sent with sufficient postage and was deposited in the mail. In any case Plaintiff did not receive it.[2] The long held "Mailbox Rule" of established evidentiary presumption can be and is in this case, being rebutted by the Plaintiff. The letter is therefore an issue of credibility which must be resolved by the trier of fact.[3]

34. The Plaintiff was forced to file three Motions to Compel, all of which were granted in order to obtain the Defendants' internal records, responses and relevant documents Bates Labeled Midland-Hinkle 000001 thru 000224. (*See* PlainApp., 00006-8 "Evidentiary Discrepancies".)

---

[2] *See* Affidavit PlainApp., 00001
[3] *Witt v. Roadway Express,* 136 F.3d 1424, 14-2930 (10th Cir. 1998) [("A rebuttable presumption of receipt does arise on evidence that a properly addressed piece of mail is placed in the care of the postal service. Because the presumption is rebuttable, however, evidence denying receipt creates a credibility issue that must be resolved by the trier of fact.") (citations omitted)]; *see also S. Frederick Sansone,* 127 NLRB 1301, 1302 n.4 (1960)

35. The Defendants claimed the records produced in discovery were from an "active file" updated regularly, however the evidence belies that claim when entries in the record which are purported to be historical fact are not consistent with previous records. (*See* PlainApp., 00006-8 "Evidentiary Discrepancies".) Such discrepancies include but are not limited to:

   a. The alleged account the defendants claim was paid in full in 2008 suddenly shows a balance belonging to a different alleged account where it showed zero in the first printing;

   b. Record is missing four years of entries from 2009 to the time of filing this suit;

   c. Dates which, if kept in the regular course of business, should be consecutive are out of chronological order and revert back;

   d. Records produced after denying their existence but others missing which should be included;

   e. Records showing conflicting balances including interest not allowed by law;

   f. Telephone calls placed to a second number in MCM's attempts to harass the Plaintiff after being told to cease and desist.[4]

36. There are entries contained in the records produced in discovery that are outright fabrications because the event described would have been virtually impossible.

37. Each time MCM called the Plaintiff's current land line they blocked their caller ID.[5] Most people, including the Plaintiff, have far better things to do in their lives than to have to

---

[4] *Meadows v. Franklin Collection Serv., Inc.*, **2011 WL 479997 (11th Cir. Feb. 11, 2011).** The court reversed the lower court's entry of summary judgment for the collector on the § 1692d(5) claim. "The statute itself recognizes that answering the phone is not necessary for there to be harassment. This makes good sense because a ringing telephone, even if screened and unanswered, can be harassing, especially if it rings on a consistent basis over a prolonged period of time and concerns debts that one does not owe."

*Atchoo v. Redline Recovery Servs.*, **L.L.C., 2010 WL 1416738 (W.D.N.Y. Apr. 5, 2010).** The court found that it was not necessary in a claim under § 1692d(5) for the consumer to allege that the defendant made a certain number of phone calls. Also, there is no requirement under this section that the consumer answer the phone. Instead, it is enough that the defendant merely causes the phone to ring continuously with the intent to annoy, abuse, or harass.

[5] *Knoll v. Intellirisk Mgmt.*, **2006 WL 2974190 (D. Minn. Oct. 16, 2006).** Denied debt collector's motion to dismiss class action where debt collector used the false name, Jennifer Smith as the Caller ID finding a claim was stated under §§ 1692d, 1692e, 1692f.

tolerate repeated calls from an entity that has been told in no uncertain terms to stop and has been notified in writing to communicate in writing only. To determine that behavior is harassment or abuse ONLY if there are many incidences of it is to say that the FDCPA should be narrowly construed and the debt collection industry should have free reign to abuse the public at will via telecommunications. The FDCPA is a strict liability statute to protect consumers and non-consumers who deal with the debt collection industry in various circumstances such as the Plaintiff.[6]

38. The Defendants claim that the Plaintiff's claims in Count IV fail in FN #21 of their motion, because the alleged account was paid in full in 2008. Plaintiff has no knowledge of any payment, the alleged account or who may have paid it. This instant case is not about the alleged debt or to whom it was owed. This case has to do with the Defendants' bad behavior in their attempts to collect money from the Plaintiff in violation of federal law. The Plaintiff is entitled to remedy under the FDCPA and the FCRA. *See Montgomery v. Huntington Bank & Silver Shadow Recovery Inc., 346 F.3d 693 (6th Cir. 2003).*[7]

39. Defendants' statements in their motion are troublesome at best when they contradict themselves and fail to provide the complete record in regard to their assertions. First they state they mailed an "offer of settlement"[8] on **October** 1, 2008 and received a check for the exact amount requested **12** days later.[9] They state in their argument that the alleged account

---

[6] *Ruth v. Triumph P'ships*, 577 F.3d 790 (7th Cir. 2009), *Brown v. Card Serv. Ctr.*, 464 F.3d 450 (3rd Cir. 2006)

[7] "A non-debtor who was subjected to abusive collection tactics may not maintain an action for violations of § 1692c(c), since that section is limited to violations directed at a "consumer" as defined in the Act, but may maintain an action for violation of §§ 1692d and 1692e, which have no such limitation and therefore apply to anyone who is the victim of prescribed misconduct", *See* also; *Keele v. Wexler, 149 F.3d 589, 594 (7th Cir. 1998)* "[T]he FDCPA is designed to protect consumers from the unscrupulous antics of debt collectors, irrespective of whether a valid debt actually exists"; *Ruth v Triumph P'ships, 577 F. 3d 790 (2nd Cir. 2009)*. The FDCPA is a strict liability statute, and debt collectors, whose conduct falls short of its requirements are liable irrespective of their intentions.

[8] This letter shows a total balance that does not match other records See Doc.85 Ex.D, Record #000219 ($395.81)and Ex. C, Records #000045,49 ($398.11), #000221, ($396.59)

[9] See Doc 85, pg 4, ¶1

was "paid in full" as of **December** 2008.[10] Bates Record heretofore "Record", labeled

000049 shows two transactions, the first shown as a payment in **full settlement** and indicated

in Record 000044, as having been paid on **October 13, 2008**. There is another on **Dec. 22,**

**2008** for a balance owed in the amount of $160.62. Record 000045 shows that the total paid

was $398.11 and on Record 000047 two entries appear, "SETTLED ACCOUNT GOOD

JOB!" dated Dec. 22 and 23, 2008. (*See* PlainApp., 00016-31) The Defendants make no

mention of a second transaction for a balance owed in their motion but the existence of it is

inadvertently referred to when they state the **two different dates** for the alleged account

having been paid in full. If the first payment had been in response to an "offer of settlement"

with a promise to close the account and cease reporting to the CRAs as they claim and the

offer was accepted and the money collected, any further collection actions would have been

clearly illegal. The Defendants cannot have it both ways. Further, Plaintiff has provided

indisputable evidence that the Defendants did not cease reporting the alleged account at least

through 2012.[11] In addition, the information they did furnish to the CRAs was not consistent

in detail and the account was reported as an "**open account.**" There is only one reason for a

debt collector to report any information on any consumer account and that is to "collect."

Defendants admit they were doing when stating their permissible purpose for having

obtained the Plaintiff's credit reports was, "attempting to collect" on the "**accounts**", (plural,

indicating both accounts) at pages 3, ¶1and 16, ¶ III(A) of their motion. If the alleged account

had no balance owing, it had literally not existed since 2008. If the Defendants were not

reporting in the hopes of obtaining money from the Plaintiff, why report it in the first place

since they didn't report it at all until after it had been paid in full? What purpose other than

---

[10] See Doc. 85 pg 8, ¶2 (l)
[11] See Doc. 58 Ex. 10a-q

deliberate and willful harm to the Plaintiff could there be? The evidence shows that when the

Plaintiff disputed the entries as "**not hers**" to the CRAs the Defendants "verified" and

continued reporting, not once but **TWICE**.[12]

40. If the documents produced in discovery are indeed a part of an ongoing, regularly updated

file, it is beyond credibility that random pages suddenly show up only when the Defendants

need them to or that dates and entries do not match earlier printings.[13]

41. The Plaintiff never received ANY communication regarding the first account allegedly

purchased in 2008, before or after her disputes with the CRAs or her written Demand for

Validation. (*See* Affidavit, PlainApp., 00001) Each time the Defendants "verified" the

account causing re-insertion and continued reporting with the CRAs it was a unique, separate

and distinct action and any violations pursuant to those actions would have a unique and

separate statute of limitations under both the FDCPA and the FCRA.

42. At pg 7, ¶2 of the Defendants' motion they state:

a. "Furthermore, the undisputed evidence also shows Midland appropriately flagged the
   accounts as "disputed" in its communications with the CRAs, thereby satisfying its
   obligations under the FDCPA."

The requirement to "flag the accounts" as disputed does not afford the Defendants' the ability

to furnish information to the CRAs that it knows or should know is false and deceptive with

impunity. Plaintiff's allegations under the FDCPA pertain to using false and deceptive means

to collect and as the courts have held, the act of reporting debts to CRAs is an attempt to

collect a debt.[14] The requirement in regard to flagging an account as disputed is further

---

[12] *See* Doc. 58, Ex. 10a-q

[13] *See* PlainApp., 00006-8 "Evidentiary Discrepancies"

[14] **Edeh v. Midland Credit Mgmt., Inc., 2010 WL 3893604 (D. Minn. Sept 29, 2010).** "The court has learned
through its work on countless FDCPA cases that threatening to report and reporting debts to CRAs is one of the
*most commonly-used arrows in the debt collector's quiver.* Consistent with the view of the FTC-and consistent with
the views expressed in Purnell, Quale, and Semper-the court finds that Midland was engaged in "collection of the

required under the FCRA rather than the FDCPA.  Those obligations are clearly enumerated in the FTC's Notice to Furnishers.[15]

43. The Defendants state in their motion that Plaintiff's claims under the FDCPA in regard to the second alleged account fail because her first dispute was "verbal" when their collectors called her home. However, the telephone call to Plaintiff on December 27, 2011 was, in fact, the MCM's first direct communication with the Plaintiff after the alleged purchase of an account on December 6, 2011 from Debt Recovery Solutions, (DRS).[16]  The first letter sent by MCM regarding that alleged account was dated December 21, 2011 but received after the Plaintiff issued her very clear verbal dispute on Dec. 27, 2011. (*See* PlainApp., 00028 and Affidavit, PlainApp., 00001)

44. The Defendants have made much of *Bleich v Revenue Maximization Grp., Inc.,* 233 F.Supp. 2d 496, 500 (E.D.N.Y. 2002) in their argument that Plaintiff's verbal dispute simply didn't count. However more recent decisions in the 2nd, 4th, and 9th Circuit Courts have upheld the clear and plain language of the statute supporting a consumer's right to dispute verbally.[17]

---

debt" in violation of § 1692g(b) when it reported Edeh's disputed debt to the CRAs before sending verification of that debt to Edeh."

[15] *See* PlainApp., 00037,38, **Notice To Furnishers Of Information: Obligations of Furnishers Under The FCRA**, under Duties After Notice of Dispute From Consumer, and  Duties After Notice of Dispute From Consumer,

[16] *See* PlainApp., 00010, "Bill of Sale"

[17] **Russell v. Absolute Collection Services**, No. 12-2357, 2014 WL 3973729 (4th Cir. Aug. 15, 2014). The debt collector argued that Section 1692g debt validation procedures *required the debtor to dispute the debt in writing.* The court disagreed, stating that such an interpretation "would thwart the statute's objective of curtailing abusive and deceptive collection practices and would contravene the FDCPA's express command that debt collectors be liable for violations of 'any provision' of the statute." ***Clark v. Absolute Collection Service, Inc., U.S. Court of Appeals,*** (4th Cir. No. 13-1151), http://www.ca4.uscourts.gov/Opinions/Published/131151.P.pdf … **Hooks v. Forman, Holt, Eliades & Ravin, LLC , 2nd Cir. May 29, 2013,** http://www.ballardspahr.com/~/media/files/alerts/2013-06-06-hooks.pdf … In ***Camacho v. Bridgeport Financial Inc.***, 430 F. 3d 1078 (9th Cir. 2005)… "a consumer need not send a writing to contest the debt under § 1692g(a)(3). (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983) (alteration in Camacho)… "the statute provides for other protections in the event of a dispute, and those protections depend only on whether a debt was disputed, and not on whether there was a prior writing."

45. The Defendants, in their zeal to obtain summary judgment fail to disclose that the second Demand for Validation letter was in regard to **"any"** alleged accounts. Plaintiff clearly informed MCM by Certified Letter reflected in Record 000033, after she had already done so verbally, that she could not provide them with anything because she had nothing to give them and no knowledge of anything connected with the accounts. The Plaintiff followed the proper processes of dispute within the FDCPA and the FCRA at all relevant times. The Defendants' internal records show that they chose to ignore and adopted the attitude that they did not have to validate, verify or cease to collect.[18]

46. Plaintiff has established through evidence including her sworn affidavit and the Defendants' own statements in interrogatories and production of documents that there are genuine issues of material fact as well as issues of credibility, which must be reserved for the trier of fact, to violations of 15 U.S.C. § 169 g(a), g(b),d(5) and 1692e and Defendant's Motion for Summary Judgment on relevant claims should be denied.

## *As to 15 U.S.C. § 1681et al:*

47. The Defendants state in their motion that they had a permissible purpose for obtaining the Plaintiff's credit reports under 15 U.S.C. § 1681b(a)(3)(A)…(Doc. 85, pg 16, ¶3(1)). However, while many courts have failed to notice the fact that the section of the FCRA the Defendants claim provides **them** with a permissible purpose does not in fact pertain to them at all but solely to the CRAs and **their** "reason to believe". In a very clear and concise ruling the court provided common sense clarity on that irrefutable fact in *Cappetta v. GC Services Ltd. Partnership, 654 F.Supp. 2d (E.D. Va 2009:*

---

[18] *See* PlainApp., 00006-8, "Evidentiary Discrepancies"

a. "Congress clearly directs the relevant portion of the FCRA toward "credit reporting agencies." See § 1681b(a), Subject to subsection (c) of this section any *consumer reporting agency* may furnish a consumer report under the following circumstances and no other." Specifically, subsection (a) allows the credit reporting agency *to* provide a credit report to a person which *it has reason to believe...* (F) otherwise has a legitimate business need for the information § 1681b(a)(3)(F). The statute requires that the credit reporting agency *(antecedent of the third person singular pronoun "it")* have "reason to believe" the "person" to which it provides a credit report "has a legitimate business need for the information." Without having such a belief, a credit reporting agency may be held liable." (*emphasis added*)

The plain language of the statute indicates Congress' intent in passing the legislation as written and must not be ignored.

48. The FTC, in 2011, updated their statement of interpretation of the FCRA in *"40 Years of Experience with the Fair Credit Reporting Act: An FTC Staff Report with Summary of Interpretations"[19]* Under Section 604 – Permissible Purposes of Reports, the FTC makes the following interpretation statements:

a. Page 44, Section 3 (B) "Reports for Review or Collection of an Account"... **Debt Collection.** A collection agency, detective agency, private investigator, or attorney has a permissible "collection" purpose under this section to obtain a consumer report on a consumer for use in obtaining payment of that consumer's account **on behalf of a creditor**.....(*emphasis added*)

49. The Defendants are not **"creditors"**, as defined by the FCRA:

a. §603 Definitions; rules of construction [15 U.S.C. § 1681a] The term "creditor" means any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit.

---

[19] http://www.ftc.gov/reports/40-years-experience-fair-credit-reporting-act-ftc-staff-report-summary-interpretations

The Defendants are debt collectors by their own definition, specifically "buyers". [20] Further, as "**buyers**" of defaulted account information from other entities, and in this case other buyers and not from creditors, they most certainly could not have been obtaining the Plaintiff's consumer credit report on **behalf of a creditor**. The Defendants are not "**assignees**" with an agreement to pay any other entity a portion of monies they collect, nor are they in a position to "**satisfy**" any obligation with an original creditor a consumer may have had. The Defendants have provided no proof of agency from a creditor which would afford them the status of assignee. Continued in the "Staff Report", *Id.*;

   b. **Page 47, Section 604(a)(3)(E),** "allows a CRA to furnish consumer reports to a person which it has reason to believe "intends to use the information, as a **potential investor** or servicer, or current insurer, in connection with, an existing credit obligation." (*emphasis added*).

The Defendants, as potential investors in consideration of the two purchases they made in regard to this case, would have had a permissible purpose to obtain the Plaintiff's credit reports, **IF** they had done so prior to either one of the closing dates of those purchases. That is not the case here; the dates of the two purchases were Sept. 24, 2008 and Dec. 6, 2011 but the Plaintiff's credit report was not obtained by them until May 7, 2012, a full 6 months after the second purchase.

50. Defendants' own records shown in Record 000035 and language contained in their 2010 SEC. 10-K Report, appear to reveal the real reason for obtaining the Plaintiff's credit report.[21] *Trans Union Corp. v. F.T.C., C.A.D.C. 1996, 81 F.3d 228, 317 U.S.App. D.C. 133* holds that consumer reporting agency's use of consumer reports for **target marketing** would

---

[20] (*See* PlainApp., 00053)
[21] "Please do not make exceptions to the recommended/discount settlement strategy. This account has been selected as part of a Marketing/Operations test".. ". (No change to that directive was ever entered into the record.) *See* PlainApp., 00006-8, "Evidentiary Discrepancies" and PlainApp. At 00055)

not be legitimate business purpose under catch-all provision of FCRA, which spells out

purposes for which credit report may be furnished; to "legitimate business need," consumer

must have sought to initiate transaction. The Plaintiff in this case **did not** seek to initiate any

transaction.

51. The FTC, tasked with the enforcement of the FCRA can certainly be considered an expert

authority on the statute. By their interpretation the Defendants as "debt buyers" could only

ever have a permissible purpose for the acquisition of a consumer credit report **IF** it is in

connection with a decision to purchase an account from another entity but there must actually

be an "existing credit obligation." If they could show a "reason to believe" the credit

obligation actually exists and is authentic they are only authorized to obtain the credit report

once, PRIOR to purchase for evaluation and assessment purposes. The failure of the justice

system to take note of these details within the statute has contributed to a broken system and

an out of control debt buying industry.[22] By certifying best information and belief to the

CRAs, the Defendants' surreptitious acquisition of Plaintiff's credit reports derived from an

interest and priority well beyond the permissible scope of the FCRA.

52. A recent decision in the Middle District of Florida, (*See* PlainApp., 00056-60), reveals that at

least one district Court has recognized the clear and vital import of the FTC's interpretation

of the statute.

53. The Defendants exhibit a well and established pattern of considering compliance with the

law to be cost prohibitive and appear to view litigation brought by consumers to be a simple

---

[22] FTC, "**Structure and Practices of the Debt Buying Industry**,"
http://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf. "**Dirty Debts Sold Dirt Cheap**", Dalie Jimenez,
http://papers.ssrn.com/sol3/papers.cfm?abstract_id=2250784 , "**Junk Justice: A Statistical Analysis of 4,400
Lawsuits Filed By Debt Buyers, Peter Holland**",, Midland Funding LLC, Midland Credit Management, among
the buyers having filed more than 1,000 cases per year during 2009 and 2010 in Maryland alone.
http://digitalcommons.law.umaryland.edu/cgi/viewcontent.cgi?article=2443&context=fac_pubs

"cost of doing business."[23] The Defendants routinely, as a collection strategy, file thousands of cases in state courts across the nation using law firms willing to aid in the operation of a litigation "factory" as stated in the recent filing by the Consumer Financial Protection Bureau (CFPB), in the Northern District of Georgia which Plaintiff asks this Court to take Judicial Notice of along with the Defendants uncorrected past behavior (*See* FNs #23, 33).[24]

54. The CFPB states in the complaint that the law firm they are suing filed more than 350,000 suits from 2009 through 2013 on behalf of banks and debt buyers such as Portfolio Recovery Associates and **Midland Funding, LLC**, "The Collection Suits". The CFPB cites the following in their complaint:

   a. "The firm filed most of the Georgia Collection Suits against consumers on behalf of debt buyers. Those buyers could not support their collection activities with basic documents, such as the original contracts underlying the alleged debts or the **chain of title evidencing that the debt buyer had standing to sue the consumer**. Defendants filed the Georgia Collection Suits **without investigating** or verifying support for the suits, including whether the facts alleged were true."[25] (*emphasis added*)

   b. "The firm routinely obtained and used affidavits in the Georgia Collection Suits in which the affiants represented that they had personal knowledge of the validity and ownership of debts. **Defendants knew or should have known that many of these affidavits were executed by persons who lacked personal knowledge of the facts.**" (*emphasis added*)

   c. "For affidavits received from its debt-buyer clients, the Firm's attorneys did not determine whether any underlying documentation for the debt was available, nor did they review the contracts governing the sale of accounts to determine whether those contracts **disclaimed any warranties regarding the accuracy or validity of the debts**." (*emphasis added*)

---

[23] ***State of Texas v. Midland Funding. LLC***, et al. http://www.msfraud.org/law/lounge/State-of-Texas-v-Midland-Funding-Encore-robosigning-2011.pdf *MARTHA VASALLE, et al., v MIDLAND FUNDING LLC*, et al, US Dist. Court, Northern District of Ohio, Western Division Case No. 3:11-cv-00096 http://www.ftc.gov/policy/advocacy/amicus-briefs/2011/06/martha-vassalle-et-al-v-midland-funding-llc-et-al. ***West Virginia v. Midland Funding LLC, Midland Credit Management Inc.,*** 2011… http://wvrecord.com/news/242479-debt-buying-company-shocked-by-mcgraws-lawsuit. ***Swanson v. Midland Funding LLC***, Minnesota http://www.ag.state.mn.us/Consumer/PressRelease/121212DebtBuyers.asp

[24] http://files.consumerfinance.gov/f/201407_cfpb_complaint_hanna.pdf

[25] http://files.consumerfinance.gov/f/201407_cfpb_complaint_hanna.pdf  page 8 ¶¶ 20, 23, pg 9 ¶24

55. Many of the allegations contained in the CFPB complaint regarding the buyers and their use of the law firm as a "litigation factory" are directly relevant to this instant action:

    a.  The Midland defendants rely on an affidavit from an individual with "no first hand fact knowledge" of any records, documents, validity of ownership, and chain of title or even basic authenticity of accounts purchased from other entities. The affiant, Angelique Ross makes no mention in her affidavit of ever working for either of the purported original creditors, having had access to their files or making any effort at any time to do so. The Midland Defendants have a well-established practice and pattern of using false affidavits in hundreds of thousands of cases across the nation and have been sued by multiple individuals and government agencies and representatives for doing so. (*Id. FN #22*) Courts have held that testimony based on a computer screen is not sufficient.[26]

    b.  The Midland Defendants state in their responses to discovery requests propounded by the *Plaintiff that Midland* Funding, LLC and Encore Capital Group **conducted no investigation after Plaintiff's multiple disputes** with the CRAs and that MCM simply relied on information from the sellers. (*Id.* ¶12)

    c.  A close look at both "Bills of Sale" reveals the two alleged accounts purchased which they reported to the CRAs as belonging to the Plaintiff were purchased WITHOUT RECOURSE OR WARRANTY. The Defendants knew or certainly should have known that Plaintiff's disputes held merit.

---

[26] **In *Unifund CCR Partners v. Cavender,*** No. 2007-CC-3040, 14 Fla.L. Weekly Supp. 975b (Orange Cty. July 20, 2007), the court held that a debt buyer "assignment" that does not refer to specific accounts does not establish ownership by the plaintiff, nor is testimony based on a computer screen sufficient.

d.  The Accounts Purchase Agreements for both purchases contain no added guarantees and state the accounts being sold and the information provided are from the "Sellers" own records, not records from any original creditor or other source. (*See* PlainApp., 00086-124)

e.  In Requests for Production propounded on the Defendants, Plaintiff sought, documents showing any verification or validation of an attempt to investigate after her disputes with the CRAs, and a complete Chain of Title for each account. The Defendants merely responded by referring to documents previously produced which are comprised of nothing more than their own internal records which they admit were created by them from information obtained from the sellers at the time of the sales.[27]

f.  The Agreement between Midland and DRS, (at pg 7, ¶3.2.3  <u>Communications</u>), states;

i.  **"Without express written authorization from Seller, Purchaser shall not make direct contact with any of all of Seller's predecessor(s)-in interest for any reason with regard to any of the Accounts sold hereunder. This includes but is not limited to: Account inquiries, Obligor information, or Account Documents (including the issuance of any Subpoena Duces Tecum) with regard to any of the Accounts sold hereunder."**

The Defendants agreed to a contract fully cognizant of the fact that the terms and conditions therein prohibited them from doing a proper investigation and therefore they could not comply with the law requiring a proper investigation should a consumer file a dispute. The Defendants did not conduct a reasonable investigation by seeking information from any first hand competent entity such as an original creditor because they were voluntarily contractually prohibited from doing so and not because the law says they don't have to or that they have no such duty.

---

[27] *See* PlainApp., 00070-82

g.  Although the Midland/DRS Agreement does state at ¶4.6 <u>Terms and Conditions</u> that Midland could have requested a "representative copy of the Terms and Conditions" historically associated with any of the Purchased Accounts", the Defendants repeatedly attempted to avoid stating they did not contact the Seller with any such request when the Plaintiff requested a copy of the written request in discovery. Plaintiff had to file her third Motion to Compel in order to get a proper answer which was that they did not make any written attempt to request from the seller. Still, Defendants simply stated they had; "no documents that are responsive to this Request" with no explanation as to why they would not have evidence of having exercised the remedy afforded by the contract with DRS or if they had in fact disposed of it. (*See* PlainApp.00083-85) Their response clearly indicates that the Defendants did not make any such request of the Seller. As there are NO ENTRIES anywhere in the records produced in discovery and relied on by the Defendants in their defense, reflecting any communication with the Seller after the Purchase in regard to the Plaintiff's dispute, there is a clear indication by the evidence, or lack thereof, that they did absolutely nothing which could be considered a "reasonable investigation."

56. The purchaser of accounts sold subject to quitclaim language knows that there is an increased probability that any given piece of information the purchaser has about those accounts will be incorrect. *See* American Law Institute – American Bar Association Continuing Legal Education, *Limited Liability Entities 2012 Update: Auriga v. Gatz*, VCU10728 ALI-AB A 667, Jan. 27, 2012 (implying that potential buyers of a property to be sold "as is" and "with all faults" would conduct necessary due diligence before deciding whether to bid.) That is

why permissible purpose for obtaining credit reports before purchase exists but the

Defendants did not do that.

57. The word "investigation" itself connotes a careful inquiry, so the review has to be reasonable.

In Johnson v. MBNA, 2004 WL 243404 (4th Cir. Va., the Court concluded MBNA's

investigation was not;

    a. "the creditor had only a computer code to review (since no documents had been
retained), it should have reported back that it could not conclusively verify that
Johnson was a co-obligor." The Johnson case sets a standard for reinvestigations, and
suggests that furnishers should not be verifying the validity of debts they have
previously reported unless they have the documents to "conclusively" refute
information submitted by disputing consumers.[28] As a general rule, whether an
investigation is "reasonable" under the FCRA is a question of fact for the jury. *See
Crabill v. Trans Union LLC,* 259 F.3d 662, 664 (7th Cir.2001).[29]

58. The Defendants quote the Plaintiff from her deposition as having said that she viewed their

letter as an attempt to shift the burden of proof onto her and that she wasn't obligated to do

that. This is an attempt to mislead as the quote is taken out of context and intent. Plaintiff was

referring to the Defendants' obligations under the FCRA to conduct a reasonable

investigation and the absence of any legal grounds for the Defendants to force the Plaintiff to

fulfill that obligation for them:[30]

    a. *"A consumer's refusal to fill out a police report or fraud affidavit does not impact
the furnishers' duty to conduct a reasonable investigation"* **See Boggio v. USAA**

---

[28] ***Johnson v. MBNA Am. Bank, NA,*** 357F.3d 426, 431 (4th Cir.2004).  Whether an investigation is **"reasonable"** is
a question of fact unless the reasonableness of the defendant's procedures is beyond question.

[29] See also, *Cunningham v Ocwen Financial,* et al. M.D. Tenn., No. 3:12-cv-0440
A Reporting Agency  "must either modify, delete, or permanently block reporting of information that it finds... to
be inaccurate or incomplete, or that cannot be verified after any reinvestigation." § 1681s-2(b)(1)(E)... "Plaintiff is
entitled to pursue his claims that Litton and Ocwen did not conduct reasonable investigations-those that were "fairly
searching ... something more than a merely cursory review" – under § 1681s-2(b)(1)(A).

[30] If a consumer disputes information with the CRA, both the CRA and the furnisher have a duty to reasonably
investigate and verify that the information is accurate. 15 USC § 1681(a)(1)(A), 1681s-2(b).
https://casetext.com/case/boggio-v-usaa-fed-sav-bank#.UwENIrRTay4

*Federal Savs. Bank, 696 F.3d 611 (6t Cir. 2012), The text of § 1681s-2(b) does not permit furnishers to require independent confirmation of materials contained in a CRA notice of a dispute before conducting the required investigation.*

Plaintiff's statement was in connection with her disputes to the CRAs not in reference to her direct disputes with the Defendants as they would have this Court believe after doing nothing more than checking electronic records created in house.[31]

59. Plaintiff has made no allegations in her Amended Complaint as to §1681s-2(a). References to erroneous information having been reported after her disputes were statements of the subsequent consequences of the Defendants' failure to meet their obligations under §1681s-2(b). However the continuance of erroneous reporting does affect the statute of limitations under the FCRA.[32] Each subsequent reporting of false information also constitutes a unique, separate, and distinct FDCPA § 1692e violation with its own time clock on statute of limitation. Defendants voluminous arguments on § 1681s-2(a) from pages 18 to 20 of their motion and all cases cited thereto are nothing more than a self-serving diatribe designed to distract and mislead the Court as Plaintiff made no allegations under 15 U.S.C. § 1681s-2(a) in her Complaint.

60. The Defendants state at pages 20 through 21 of their motion, that their actions were not willful, cite cases holding to that theory and upon that premise conclude that the Plaintiff is

---

[31] ***Dixon-Rollins v. Experian Information Solutions, Inc., et al*** E.D. Penn., Sept. 23, 2010, No. 09-0646 Mem. Opinion, "It was not unreasonable for the jury to conclude that Trans Union willfully or recklessly violated the FCRA by doing nothing more than "parroting information" it received from ACCB. (citing) ***Cushman***, 115 F.3d at 225 ("[A] **'reinvestigation' that merely shifts the burden back to the consumer** and the credit grantor cannot fulfill the obligations contemplated by the statute."); ***Campbell v Chase Manhattan Bank***, *USA, N.A.*, No. 02-3489, 2005 WL 1514221, at* 16 (D.N.J. June 27, 2005) **(parroting information received from original source may be considered a willful violation of the FCRA)**;…Saenz v. Trans Union, LLC, 621 F. Supp. 2d 1074, 1083 (D. Or. 2007) (Trans Union must do more than parrot information received by original source);

[32] *As the court noted in* ***Larson v Ford Credit, No. 06-cv-1811 JMR/FLN, 2007 WL 1875989 (D. Minn. 2007)***, *"[t]he majority of courts considering the question have drawn upon defamation's traditional 'multiple-publications rule'. Under this rule, each publication of the same falsehood by the same defamer is a separate cause of action, thus starting the limitations clock anew." (citing Restatement (Second) of Torts § 577A(1). In the FCRA context, this means each transmission of erroneous credit information is a separate FCRA violation.*

not entitled to punitive damages under the FCRA. At all times pertinent hereto, Defendants'

actions, acting by and through its agents, servants and/or employees, were malicious,

intentional, willful, reckless, and in grossly negligent disregard for federal laws and the rights

of the Plaintiff herein.

61. The Defendants proffered much the same defense in the case of *Brim v. Midland Credit Management, Inc., 795 F. Supp.2d 1255 (2011)*[33] that are in large part analogous to the instant case before this Court. Rather than accept the jury's verdict in Brim, MCM sought to vacate the judgment or reduce the Plaintiff's award. The court refused, finding that a punitive damages award of roughly six times the actual damages awarded was appropriate under Supreme Court standards. Furthermore, it supported the ultimate objectives of deterrence and punishment for credit report abuse. The court noted:

   a. *"In the facts before this court, the degree of reprehensibility is great, as defendant has stood by a faulty system for years, insisting its procedures are reasonable, in the face of obvious evidence otherwise."*

   b. *"Under the defendant's system, when a consumer disputes a debt, 95% of such disputes are checked by a computer merely making sure the disputed debt is the same as the information defendant has in its system already. Upon such review, defendant then asserts the debt is valid each and every time. As Plaintiff points out, defendant receives about 8,000 disputes per week and for 95% of those disputes, defendant checks its own records as a means of validating the debt, although the debts are all purchased, at discount, from various creditors who have been unable to collect on them. The jury determined defendant's conduct to be reprehensible. This court will not set that finding 1264\*1264 aside, as there is more than sufficient evidence to support such a finding."*

62. This instant case appears to be an instant replay of the Brim case, in that the Defendants contend they have no obligation under the law to have done anything more than consult the

---

[33] Brim v. Midland Credit Management, Inc., CV-10-J-369-NE (N.D. Ala. Jan. 11, 2011) (summary judgment opinion), available at www.gpo.gov/fdsys/granule/USCOURTS-alnd-5_10-cv-00369/USCOURTS-alnd_5_10-cv-00369-0/content-detail.html.

same information they reported to the CRAs from their own records. Those records contain

nothing but hearsay information from other buyers without any authenticating evidence from

a qualified source as to its truth and validity. Just as in Brim and many other cases involving

the Midland Defendants, mere computer generated inquiries masquerade as human

intervention and cognitive investigation.  The Defendants have no documentation from any

original creditor authenticating any accounts nor did they ever, as evidenced in their own

records and by the agreements under which both purchases were made, attempt to verify the

information contained in the spread sheets purchased.[34] The Defendants have failed to

demonstrate exactly what they did to meet the burden of a "**reasonable investigation**",

which would be a question of ultimate material fact and therefore clearly a matter for the trier

of fact and a genuine issue before the Court. The accuracy and veracity of the Defendants'

alleged business records as well as their actions are very much open to question and are

issues of material fact before this Court.

63. The telephone calls placed to the Plaintiff's home were for the purpose of collection as stated

by the Midland representative and not for the purpose of discussing the Plaintiff's repeated

disputes with the CRAs or her formal disputes with the Defendants.

64. Both alleged accounts were purchased not from original creditors but pursuant to "as is"

contracts with "no warranty" as to accuracy, validity, or authenticity from other Debt Buyers.

Similar contracts between the Midland Defendants and sellers are readily available online as

are a number of others, [35] which firmly establishes that the contents of such contracts are

---

[34] This constitutes a decided lack of historical fact. The resolution of disputes over historical facts or the inferences
to be drawn from them is a jury function. A dispute over historical facts or inferences, if genuine and material within
the meaning of Rule 56, precludes summary judgment.
[35] Jefferson Capital/Midland Funding and Encore Capital Group: http://agreements.realdealdocs.com/Asset-
Purchase-Agreement/ASSET-PURCHASE-AND-FORWARD-FLOW-AGREEMEN-228804/#doc_start , FIA Card
Services/CACH, LLC Forward Flow Agreement:
https://s3.amazonaws.com/s3.documentcloud.org/documents/329733/fia-to-cach-forward-flow.txt, U.S.

already a matter of public record. Absolutely no supporting documents connected with the Plaintiff such as signed contracts, applications, card holder agreements, or billing statements were included in the sale. The Defendants show no effort whatsoever to seek any supporting documentation or information beyond the bare and contradictory information received in spreadsheets at the times of the sales. To the contrary, the only effort they made was to make a request to and expect the Plaintiff to instead prove a negative and somehow come up with proof that something she had no knowledge of did not exist. 15 U.S.C. § 1681s-2(b) does not place a duty of investigation on the consumer but does so squarely on the CRA and the furnisher.

65. There remains glaring genuine issues of material fact before the Court as to the "reasonableness" of the Defendants' actions in regard to their obligation of investigation under 15 U.S.C. § 1681S-2(b) and therefore the Defendants' Motion for Summary Judgment in regard to that section of the statute should be denied.

66. The Defendants make much of the time lapse between the Plaintiff's disputes with both the Defendants and the CRAs before filing this suit and at the same time complain that the Plaintiff could have avoided the whole thing by following the procedures for dispute enumerated by the statutes. Apparently numerous disputes both written and oral, letters of intent and demands for validation of the alleged accounts were not enough, let alone the 18 months the Plaintiff afforded the Defendants to resolve the disputes before engaging in litigation. The Defendants, in fact, did nothing to resolve the issue other than demand money from the Plaintiff and ask the Plaintiff to assist them in their statutorily required obligations

---

Bank/Livingston Financial - http://dalie.org/wp-content/uploads/2014/02/2009.01.30-USB-and-Livingston-Forward-Flow-amts-may-be-wrong-as-is-rep-of-compl-with-laws.pdf, Arrow Financial/CACH LLC, - http://debtbuyeragreements.com/wp-content/uploads/2014/03/Arrow-Financial-Services-LLC-to-CACH-LLC-11-09-2007.pdf

to investigate. The Plaintiff is at a loss as to what else she could have done short of standing on her head and is highly doubtful given the Defendants' responses to other consumers' well founded disputes such as Brim[36], that even if she had spent those 18 months standing on her head the outcome would have been any different.

67. Even a cursory search on the Internet will produce an exorbitant number of consumer complaints and statements about the Defendants in this case violating consumer protection statutes using egregious and harassing tactics to collect on bogus debts from paid off accounts, false credit cards and non-existent telecommunications accounts. Their actions include alleged cell phone accounts which do not exist including supposedly originated with Sprint, Verizon, SunCom, and **T-Mobile**. (*See* PlainApp., 00039-41)

68. To prevail on her claim of violations of the FCRA, the Plaintiff must prove the following elements as a matter of law: Defendant MCM obtained Plaintiff's credit report with no permissible purpose and that her claim was brought within the statute of limitations of the FCRA. That Defendants, MCM and Midland did not perform a reasonable investigation before verifying the alleged accounts they were reporting to the CRAs after Plaintiff filed disputes. That Defendant Encore is vicariously liable for the actions of both of its wholly owned subsidiaries in regard to these violations as a result of their direct oversight of their operations. Because there are genuine issues of material fact on elements of the violations of

---

[36] Midland never investigated the dispute except by conducting a cursory computer check against its own minimal records. The consumer's lawyer reports that Midland never had a single employee actually investigate any of the disputes, and it never contacted the seller about the alleged debt. Midland's position – which is not uncommon among, furnishers of information to the CRAs – was that it had no responsibility to do anything because its computer "investigated" the dispute when it reviewed the information in Midland's own internal system and compared it with the information supplied by the CRAs. Midland's other argument was that even if they had contacted the seller of the debt, the result would have been the same. The trial court upheld the jury's verdict, noting that, "...the defendant maintained throughout the trial that it had no obligation to determine the accuracy of the accounts it attempted to collect, even though it, in turn, reports them to credit reporting agencies."

the FCRA made by the Plaintiff, the Defendants Motion for Summary Judgment should be denied.

## **OBJECTIONS**

69. The evidence submitted in support of Defendants' motion should not be considered by the Court because it is not properly authenticated, is hearsay, is untrustworthy and refers to facts not in evidence before the Court. The Court should strike the following summary judgment proof:

    a.  Defendants rely on an untrustworthy affidavit.

        i.  Defendants provide and rely on the affidavit of Angelique Ross with no substantiated and authenticated evidence annexed thereto in support of statements made.

        ii.  The affidavit refers to facts not in evidence before the Court and is hearsay.

        iii.  Statements made in the affidavit have been shown to be patently false making the entire affidavit untrustworthy.

    b.  Affiant, Angelique Ross states that she is "familiar" with records and facts as a "Senior Group Manager" at MCM yet there is nothing on the record establishing that she is in fact a custodian of records at present or at all times relevant to this case. Nor is there anything on the record that establishes that she is even employed by or authorized to speak on behalf of the three Defendants. The Affiant and her qualifications and any training alleged knowledge are not affirmatively identified. This draws into question Affiants' competence and authority to testify.[37] The Affiant

---

[37] Affidavits in support of a Motion for Summary Judgment must state that the statements made therein are made on personal knowledge, must set forth facts which would be admissible in evidence, and must show affirmatively that the affiant is competent to testify to the matters stated therein. *Youngstown Sheet & Tube Co. v. Penn,* 363 S.W.2d 230, 233 (Tex.1962); Tex. R.Civ.P. 166-A(e). The affidavit must not merely state that the affiant is competent to testify to the matters stated therein; but rather there must be something in the affidavits to show affirmatively how

makes statements which have not been proven and are very much in dispute such as that the Midland accounts were debts owed by the Plaintiff. She reveals the information she relies on came not from a creditor but the sellers, (other buyers). She does not state that she ever worked for either of the two alleged original creditors or the sellers and therefore could have no first hand fact knowledge of the validity, authenticity, accuracy or origination of the information she relies on in making her statements. She admits the information in the records she claims to be "familiar" is not from any original creditors but from data printed by MCM off electronic records provided by the previous debt buyer sellers. The Affiant makes a statement in regard to the reporting of the alleged GE account which Plaintiff has already proven by irrefutable evidence to be blatantly false. (*See* Doc. 58 Ex. 10a-q). Further, the Affiant has proved herself to be an unqualified witness without first-hand knowledge when the Midland Defendants proffered her as an expert witness in an on-going case in the Northern District of California.[38]

70. Defendants failed to comply with FRCP 26 which requires both parties to submit to the other their 26(a)(1) disclosures within 14 days after the completion of the 26(f) conference and to update any disclosures or discovery responses as proscribed by the rule.

71. Defendants' Motion for Summary Judgment and all its attachments and exhibits should be stricken by sanction for failure to comply with FRCP 26 *See David v. Caterpillar, Inc.*, 324

---

the affiant is competent to testify. *Murfee v. Oquin*, 423 S.W.2d 172, 174 (Tex.Civ.App.-Amerillo 1967, writ ref'd n. r. e.).

[38] *Gold v. Midland Credit Management, Inc., et al.*, https://ecf.cand.uscourts.gov/cgi-bin/HistDocQry.pl?106800721649407-L_1_0-1... Doc. 65 pg 4-B, Ms. Ross stated she had "general knowledge", did not have "specific information" and was proven to be unqualified to testify to the matters the Defendants appointed her to attest to.

F.3d 851, 857 (7th Cir. 2003)[39] Plaintiff asks the Court to strike Defendants' Motion for Summary Judgment in its entirety from the record but in the alternative, Plaintiff has addressed the issues argued by the Defendants in their motion and shown there are issues of material fact before this Court.

## SUMMARY JUDGMENT EVIDENCE

72. In support of her response, Plaintiff includes the following evidence in the attached appendix:

   a. Plaintiff's Appendix, 00001- The Affidavit of Teri Lynn Hinkle which establishes that dispute processes outlined in the FDCPA and FCRA were adhered to at all times, that Plaintiff had no communications with the Defendants prior to 2011, that purported facts contained in the Defendants' alleged business records are false and that the Plaintiff made numerous attempts to resolve the issues prior to litigation.

   b. Plaintiff's Appendix of Documents 00000 – 00124

## CONCLUSION

73. The Defendants have not met their burden to show that there are no material facts at issue for any element of the Plaintiff's Complaint. In determining whether genuine issues of material fact exist, "factual controversies are construed in the light most favorable to the non-movant, but only if both parties have introduced evidence showing that an actual controversy exists," Lynch Props. 140 F.3d at 625. The Defendant has proffered nothing more than an

---

[39] *David v. Caterpillar, Inc.*, 324 F.3d 851, 857 (7th Cir. 2003), "This court has stated that 'the sanction of exclusion is automatic and mandatory unless the sanctioned party can show that its *violation* of Rule 26(a) was either justified or harmless.' However, we also have stated that '[t]he determination of whether a Rule 26(a) violation is justified or harmless is entrusted to the broad discretion of the district court." See also *Westefer v. Snyder*, 422 F.3d 570, 584 n.21 (7th Cir.2005) and *Dugan v. Smerwick Sewerage Co.*, 142 F.3d 398, 407 (7th Cir. 1998)…"Unlike its [FRCP] 11counterpart, which now assigns to the discretion of the district court whether to impose sanctions for a violation of the rule, [FRCP] 26(g)(3) still *requires* that sanctions be imposed in the event of a violation." *Thibeault v. Square D Co.*, 960 F.2nd 239, 245 (1st Cir. 1992). FRCP 26(e) does not require "that a court order must be in effect, and then violated, as a prerequisite for the imposition of sanctions…. The rule itself furnishes fair warning."

untrustworthy affidavit of alleged facts proven to be false and misleading; and business records created from unauthenticated, inaccurate and unsubstantiated information gleaned from electronic records purchased from two other third parties containing numerous contradictions, false entries and missing data. There is no reliable evidence to prove that the Defendants did not violate the FDCPA and the FCRA nor is there one iota of evidence presented to prove the Defendants performed any investigation after the Plaintiff's disputes with the CRAs much less one that could be considered "reasonable" under the statute. The Defendants have made nothing more than conclusory and misleading statements in their defense. "Summary Judgment will not lie if the dispute about a material fact is "genuine", that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. At the summary judgment stage, the trial judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial" *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242 (1986).

   **WHEREFORE**, because the Defendants have failed to show there are no issues of material fact before the Court and the Plaintiff has shown there are substantial material issues, the Plaintiff respectfully requests the Court DENY the Defendants' Motion for Summary Judgment, strike the Defendants' affidavit, and allow Plaintiff's claims to move forward to trial on the merits.

   DATED this 3rd day of September, 2014

   Respectfully Submitted

   Teri Lynn Hinkle

## CERTIFICATE OF SERVICE

I hereby certify that I presented the foregoing copies of **PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**, to **Mathew B. Ames, and Joshua M. Moore, Balch & Bingham LLP**, Counsel for Defendants, **MIDLAND CREDIT MANAGEMENT, MIDLAND FUNDING LLC., AND ENCORE CAPITAL GROUP, INC.** via USPS on September 4, 2014.

Sent to:

Mathew B. Ames & Joshua M. Moore
Balch & Bingham LLP
30 Ivan Allen, Jr. Blvd. N.W.
Suite 700
Atlanta, Georgia 30308-3036

Teri Lynn Hinkle
322 Bethel Street
Eastman, Georgia 31023

Schedule package pickup right from your home or office at usps.com/pickup
Print postage online - Go to usps.com/postageonine

PLEASE PRESS FIRMLY

Tel. No.: (        )

PLEASE PRESS FIRMLY

# UNITED STATES POSTAL SERVICE

# EXPRESS® MAIL

## Mailing Envelope
### For Domestic and International Use

## EXTREMELY URGENT

Please Rush To Addressee

Visit us at usps.com

PRESS HARD! YOU ARE MAKING 3 COPIES

ORIGIN (POSTAL SERVICE USE ONLY)

FROM: (PLEASE PRINT)  PHONE (        )

Marla
322 Bethel St
Emma GA 30093

FOR PICKUP OR TRACKING
Visit WWW.USPS.COM
Call 1-800-222-1811

EI 352279408US

DELIVERY (POSTAL SERVICE USE ONLY)

TO: (PLEASE PRINT)  PHONE (        )

Clerk US District Court
100 Box 1130
Augusta GA

CUSTOMER USE ONLY

# EXPRESS MAIL

## UNITED STATES POSTAL SERVICE®
### Post Office To Addressee

Addressee Copy
Label 11-B, March 2004

Misuse may be a violation of federal law. This package is not for resale.

When used internationally
affix customs declarations
(PS Form 2976, or 2976A).



U.S. POSTAGE
$19.15

© 2009 USPS
Packaging is the property of the U.S. Postal Service and is provided solely for use in sending Express Mail® shipments.

Please Recycle

EP13C