[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 15-10398
_____

D.C. Docket No. 3:13-cv-00033-DHB-BKE

TERI LYNN HINKLE,

Plaintiff – Appellant,

versus

MIDLAND CREDIT MANAGEMENT, INC.,
MIDLAND FUNDING, L.L.C.,
ENCORE CAPITAL GROUP, INC.,

Defendants – Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(July 11, 2016)

Before HULL and BLACK, Circuit Judges, and MORENO,[*] District Judge.

_____

[*] Honorable Federico A. Moreno, United States District Judge for the Southern District of
Florida, sitting by designation.

BLACK, Circuit Judge:

Teri Lynn Hinkle appeals the grant of summary judgment in favor of Midland Credit Management, Inc., Midland Funding, L.L.C., and Encore Capital Group, Inc. (collectively Midland[1]), for claims asserted by Hinkle under the Fair Credit Reporting Act (FCRA), 15 U.S.C. § 1681 *et seq*., and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 *et seq*.  Hinkle claims that Midland erroneously attributed debts to Hinkle, reported the debts to Experian, Equifax, and TransUnion credit reporting agencies (the CRAs), and failed to properly verify the debts when Hinkle disputed their validity.  The district court held that no reasonable jury could find that Midland violated the FCRA or the FDCPA with respect to Hinkle.  We reverse and remand as to Hinkle's claims under § 1681s-2(b) of the FCRA.  We affirm as to all other claims.[2]

## I.  BACKGROUND

A consumer debt is created when an entity such as a bank, a credit card company, or a cell phone provider (an "original creditor") extends credit to a

---

[1] Midland Credit Management and Midland Funding are wholly-owned subsidiaries of Encore Capital Group.  Midland Funding is a debt buyer that purchases charged-off debt accounts.  Midland Credit Management is a debt collector that specializes in servicing debt accounts purchased by Midland Funding.

[2] We conclude that all other claims, including but not limited to claims under § 1681b of the FCRA and §§ 1692d, 1692e, and 1692g of the FDCPA, are dismissed, waived, abandoned, or lack merit.  The undisputed facts of this case are sufficient to resolve the controlling issues on appeal.  We therefore make no determination as to whether the district court erred in admitting the affidavit of Angelique Ross to authenticate documents Midland relied on at summary judgment.

consumer.  The consumer must then make payments on the debt in accordance with the terms of her contract with the original creditor.  *See* Federal Trade Commission, *The Structure and Practices of the Debt Buying Industry*, 2013 WL 419348, at *10 (Jan. 2013) (hereinafter "FTC Report").  Should a consumer fall behind on her payments, the original creditor will eventually be entitled to "charge off" the debt as severely delinquent.  *See id.* at *12.  Charged-off debt is deemed uncollectable and treated as a loss for accounting purposes.  *LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1188 n.5 (11th Cir. 2010).  But charging off a debt does not diminish the legal right of the original creditor to collect the full amount of the debt.  *See id.* ("[C]harged off debt is not forgiven."); FTC Report, 2013 WL 419348, at *14 (describing measures taken by original creditors to collect charged-off debts).

Once a debt has been charged off, there are two ways an original creditor can recoup its losses.  First, the original creditor may continue attempting to collect the debt itself—either by utilizing internal collections staff, *see* FTC Report, 2013 WL 419348, at *14, or by contracting with a third-party agent (a "collection agency") willing to collect the debt on behalf of the original creditor, *see, e.g.*, *Westra v. Credit Control of Pinellas*, 409 F.3d 825, 826 (7th Cir. 2005).  Alternatively, the original creditor may choose to sell the debt to a third-party purchaser (a "debt buyer") at a discounted price based on the reduced likelihood of

collection.  FTC Report, 2013 WL 419348, at *18.  When an original creditor sells

a debt, the original creditor relinquishes its right to collect the debt and transfers

that right to the debt buyer.  *See id.* at *11-14.  This allows the original creditor to

wash its hands of the debt while still recouping a fraction of its losses on the

secondary debt market.  *Id.* at *11.

The buyer of a debt on the secondary debt market enjoys essentially the

same prerogatives as did the original creditor.  The debt buyer may attempt to

collect the debt itself—internally, or by hiring a collection agency—or the debt

buyer may resell the debt to another debt buyer.  *Id.*  When the initial buyer of a

debt is unable to collect, the buyer can recoup a fraction of its losses by including

the debt in a portfolio of uncollected debts and selling it down the line to another

debt buyer (a "down-the-line buyer") at an even deeper discount.  *See id.* at *3,

*15.  The down-the-line buyer can, in turn, choose whether to engage in collection

activities or to sell the debt further down the line.  *Id.* at *15.  Debts that have been

repeatedly bought and sold in this manner are sometimes referred to as "junk

debts."  *See, e.g.*, *Osinubepi-Alao v. Plainview Fin. Servs., Ltd.*, 44 F. Supp. 3d 84,

87 (D.D.C. 2014); *Bodur v. Palisades Collection, LLC*, 829 F. Supp. 2d 246, 255

(S.D.N.Y. 2011).  They are often sold "as is," in the form of electronic data, and

without "account-level documentation" such as applications, agreements, billing

statements, promissory notes, notices, correspondence, payment checks, payment

histories, or other evidence of indebtedness.[3]  FTC Report, 2013 WL 419348, at

*3-4, *28-29.

This case involves two such "junk debts," the GE/Meijer and T-Mobile

accounts, both of which Midland purchased "as is," without account-level

documentation, after a down-the-line journey from one debt buyer to another.  On

September 24, 2008, Midland acquired a debt account originating with GE/Meijer

in the amount of $357.56 attributable to "Terri Hinkle."  Midland purchased this

debt from AIS Services, L.L.C. (AIS), another buyer of charged-off consumer

debt.  The account was sold "as is" save for a limited warranty by AIS that the

information associated with the account was "materially true and accurate to the

best of [AIS's] knowledge."  Midland acknowledged in the purchase agreement

that the account "may be [an] unenforceable debt[] and may have little or no

value."  The only documentation Midland received was a data file containing

electronically-stored information about the debt such as the amount of the debt, the

name of the original creditor, the charge-off date, and the personal information

---

[3] This is done to lower transaction costs and facilitate the quick sale of low-value debts.
*See* FTC Report, 2013 WL 419348, at *21-22.  But the lack of account-level documentation can
prevent debt buyers from litigating disputed debts on the merits.  *See, e.g.*, N.C. Gen. Stat. § 58-
70-115(5) (prohibiting a "debt buyer" from "bringing suit or initiating an arbitration proceeding
against [a] debtor" without "reasonable verification of the amount of the debt allegedly owed by
the debtor [including] a copy of the contract or other document evidencing the consumer debt");
*Henggeler v. Brumbaugh & Quandahl, P.C., LLO*, 894 F. Supp. 2d 1180, 1187 (D. Neb. 2012)
(denying a motion to compel arbitration because a debt buyer failed to demonstrate that "a valid
agreement to arbitrate exists" and "submitted only a generic cardmember agreement from Chase
Bank" that was "unsigned").

associated with the debt.  Although Midland did not receive any account-level documentation, the purchase agreement required AIS to assist Midland in acquiring documentation from the original creditor if necessary to respond to consumer disputes.[4]

A week after acquiring the GE/Meijer account, Midland sent a collection letter to the address on file stating that the current balance of the debt was $395.81 and offering to settle the debt for $237.49.  On October 13, 2008, Midland received a payment for the settlement amount.  The record does not reflect who made this payment.  On November 17 and December 15, 2008, Midland reported to the CRAs that the debt belonged to Hinkle and was "assigned to internal or external collections."  On December 22, 2008, Midland zeroed out the account and marked it paid in full.  Midland reported the account to the CRAs as "paid in full" in January, February, and March of 2009.  Thereafter, Midland ceased reporting the account.  The CRAs marked the account "paid" but continued to show that it had been in "[c]ollection as of Dec 2008, Nov 2008."

Hinkle claims that she did not pay the GE/Meijer debt and in fact did not receive any correspondence from Midland regarding the GE/Meijer account.

---

[4] The purchase agreement requires AIS to contact the original creditor upon Midland's written request and, to the extent account-level documentation is "reasonably available and provided to [AIS]," provide copies to Midland.  The purchase agreement specifically permits Midland to invoke this right "after the Closing Date . . . in order to respond to [consumer] inquiri[es]."

Hinkle became aware of the GE/Meijer account in May 2011, when she obtained her credit report and discovered that Midland had erroneously attributed the account to her. On September 6, 2011, Hinkle filed a dispute with the CRAs explaining that the GE/Meijer account did not belong to her. The CRAs notified Midland of the dispute, stating: "Consumer states inaccurate information" and "[c]laims true identity fraud, account fraudulently opened." The CRAs instructed Midland to "Verify Name, address, SSN, Dates and Balance." Additionally, on October 20, 2011, Hinkle sent Midland a written "Demand for Validation of Debt," reiterating that she had never had an account with GE/Meijer. Midland did not take action on Hinkle's dispute because it had already marked the account paid and ceased to report it to the CRAs.

On December 6, 2011, Midland acquired a debt originating with T-Mobile in the amount of $300.80 attributable to "Teri Hinkle." Midland purchased this debt from Debt Recovery Solutions, L.L.C. (DRS), also a buyer of charged-off consumer debt. Like the GE/Meijer account, the T-Mobile account was sold with limited warranties as to its accuracy or collectability.[5] The only documentation Midland received was a data file containing electronically-stored information about the debt. Also like the GE/Meijer account, the T-Mobile account was sold without

---

[5] DRS warranted "[t]o the best of [its] knowledge" that the information associated with the account was "true, complete, accurate and not misleading." The purchase agreement also contains a warranty that the information DRS was providing to Midland consisted of "[DRS's] own business records regarding the Accounts."

7

any account-level documentation.  The purchase agreement required Midland to obtain "express written authorization" from DRS before requesting account-level documentation from the original creditor.  DRS promised to "act on behalf of [Midland] as an intermediary" between Midland and the original creditor to investigate inquiries regarding the T-Mobile account, but the parties disagree regarding whether the purchase agreement permits Midland to invoke that promise after closing.

On December 21, 2011, Midland sent a collection letter to Hinkle offering a 10% discount to resolve the debt.  On December 28, 2011, Midland called Hinkle in an attempt to reach settlement.  Hinkle orally disputed the debt, informing Midland that the account did not belong to her.  Midland recorded the dispute as "FRAUD/ID THEFT . . . CONSUMER SAID THAT SHE DOESN'T OWE THAT BILL."

On February 5, 2012, Midland sent Hinkle a letter advising her that it was investigating her dispute and telling her that "[a]s part of our investigation . . . it would be helpful to have a copy of any documentation you may have that supports your dispute."  Apart from this letter, however, Midland did not take action on the December 28, 2011, dispute.  Internal Midland records note that, notwithstanding its disputed status, Hinkle's account was "OK to work" because the dispute was

"outside validation period.  Consumer needs to send proof."[6]  In February 2012,

Midland began reporting to the CRAs that the debt was "assigned to internal or

external collections."  When Midland made these reports, it flagged the debt as

"[d]isputed."  On July 5, 2012, Hinkle obtained a copy of her credit report

reflecting these designations.

On July 13, 2012, Hinkle disputed the T-Mobile account with the CRAs.

The CRAs notified Midland of the dispute on July 20, 2012.  Midland was advised:

"Dispute Type 1-Not his/hers. Verify Name, address, SSN, Dates and Balance."

Upon receipt of this request, Midland verified the debt by double-checking the

information it had reported to the CRAs against its own internal records.  These

records consisted of the same electronically-stored information Midland received

from DRS when it purchased the debt.  Midland did not request account-level

documentation from DRS or T-Mobile.

On July 21, 2012, Midland sent Hinkle another letter asking her to provide

documentation supporting her dispute.  Hinkle responded to Midland on July 26,

2012, reiterating that neither the T-Mobile account nor the GE/Meijer account

belonged to her and requesting validation of "ANY ALLEGED ACCOUNT WITH

Teri Lynn Hinkle."  She told Midland that she could not furnish Midland with

---

[6] The phrase "validation period" is a reference to § 1692g of the FDCPA, which requires a debt collector to validate a debt when a consumer disputes the debt in writing within a certain period of time.  15 U.S.C. § 1692g(b).

"ANYTHING" because "I do not have that alleged account."  Hinkle also advised Midland that she intended to sue Midland for violations of the FCRA and FDCPA. Midland continued to report the T-Mobile debt as "assigned to internal or external collections" through March 2013.

Proceeding *pro se*, Hinkle filed this lawsuit on April 30, 2013.  During discovery, Hinkle requested documents and written discovery responses from Midland, but she did not take any depositions.  The trial court advised Hinkle that she should seriously consider "tak[ing] some depositions," but Hinkle chose not to do so.  At the close of discovery, Midland filed a motion for summary judgment relying on the documents it produced to Hinkle during discovery.  The district court granted the motion and entered judgment in favor of Midland on all counts. Hinkle appeals.

## II.  STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment *de novo*, "viewing all facts and reasonable inferences in the light most favorable to the nonmoving party."  *Jurich v. Compass Marine, Inc.*, 764 F.3d 1302, 1304 (11th Cir. 2014).  "Summary judgment is appropriate where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law."  *Id.*  "[T]he dispute about a material fact is 'genuine' . . . if the evidence is

such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510 (1986).

## III.  DISCUSSION

Hinkle argues on appeal that the district court erred in granting summary judgment in favor of Midland on her claim that Midland violated § 1681s-2(b) of the FCRA.  The FCRA requires CRAs and entities that furnish information to CRAs ("furnishers" or "furnishers of information") to investigate disputed information.  When a consumer disputes information with a CRA, the CRA must "conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate."  15 U.S.C. § 1681i(a)(1)(A).  As part of this investigation, the CRA is required to notify the person or entity that furnished the information that the information has been disputed.  *Id.* § 1681i(a)(2).  Upon receipt of this notice, the furnisher of information must:  (1) "conduct an investigation with respect to the disputed information"; (2) "review all relevant information provided by the [CRA]" in connection with the dispute; and (3) "report the results of the investigation to the [CRA]."  *Id.* § 1681s-2(b)(1).  Should the investigation determine that the disputed information is "inaccurate or incomplete or cannot be verified," the furnisher must "as appropriate, based on the results of the reinvestigation promptly . . . modify[,] . . . delete [or] permanently block the reporting" of that information to CRAs.  *Id.* § 1681s-2(b)(1)(E).  The

CRAs must also delete or modify the information based on the results of reinvestigation.  *Id.* § 1681i(a)(5)(A)(i).

When the CRAs informed Midland that Hinkle disputed the GE/Meijer and T-Mobile accounts, Midland conducted an investigation that consisted—at most— of (1) double-checking the information it had reported to the CRAs against its own electronic-data files; and (2) sending Hinkle a letter telling her that "it would be helpful to have a copy of any documentation you may have that supports your dispute."[7]  The district court held that these two measures amounted to sufficient investigation under § 1681s-2(b) on the facts of this case.  Hinkle contends that § 1681s-2(b) requires down-the-line buyers to investigate mistaken-identity disputes by verifying the identity of the alleged debtor against account-level documentation (not just against electronic-data files).  She argues that because Midland failed to obtain such documentation in response to Hinkle's dispute, a reasonable jury could find that the investigation Midland conducted was insufficient to satisfy § 1681s-2(b).

---

[7] Midland suggests on appeal that it did not take action on the GE/Meijer dispute because by the time the dispute was filed in 2011 it had already marked the account paid and ceased to report it to the CRAs.  We are unaware of any provision in the FCRA that relieves furnishers of their obligations under § 1681s-2(b) once they are no longer actively reporting the disputed account.  As it makes no difference to the result, we assume for the purposes of this opinion that Midland at least reviewed its internal records when it received a dispute notice regarding the GE/Meijer account.  *Cf. Perez v. Suszczynski*, 809 F.3d 1213, 1217 (11th Cir. 2016) ("[W]hat are considered the 'facts' [at summary judgment] may not turn out to be the 'actual' facts if the case goes to trial.")

The scope of the duty to investigate under § 1681s-2(b) is an issue of first impression in the Eleventh Circuit.  The FCRA does not specify the nature and extent of the "investigation" a furnisher of information must conduct under § 1681s-2(b).  The structure of the statute, however, suggests that the duty of a furnisher under § 1681s-2(b) is a component of the larger reinvestigation duty imposed by § 1681i(a) on CRAs themselves.  *See id.* § 1681s-2(b)(2) (requiring furnishers to complete their investigation and report its results "before the expiration of the period . . . within which the [CRA] is required to" resolve the dispute).  We have previously stated that § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer."  *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991).  Given the interrelated nature of §§ 1681s-2(b) and 1681i(a), we conclude that "reasonableness" is an appropriate touchstone for evaluating investigations under § 1681s-2(b).  *See Chiang v. Verizon New England, Inc.*, 595 F.3d 26, 37 (1st Cir. 2010); *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009); *Westra*, 409 F.3d at 827; *Johnson v. MBNA Am. Bank, NA*, 357 F.3d 426, 431 (4th Cir. 2004).

We emphasize that what constitutes a "reasonable investigation" will vary depending on the circumstances of the case and whether the investigation is being conducted by a CRA under § 1681i(a), or a furnisher of information under

§ 1681s-2(b). *See Chiang*, 595 F.3d at 38 ("[W]hat is a reasonable investigation by a furnisher may vary depending on the circumstances."); *Gorman*, 584 F.3d at 1160 ("[T]he reasonableness of an investigation depends on the facts of the particular case . . . ."). Whether a furnisher's investigation is reasonable will depend in part on the status of the furnisher—as an original creditor, a collection agency collecting on behalf of the original creditor, a debt buyer, or a down-the-line buyer—and on the quality of documentation available to the furnisher. *See, e.g.*, *Johnson*, 357 F.3d at 431 (reasoning that a jury could find a § 1681s-2(b) violation where the original creditor ended its investigation before "consult[ing] underlying documents such as account applications"). The facts of this case require us to determine whether a reasonable jury could find that Midland—a down-the-line buyer with "as is" purchase agreements and no account-level documentation—fell short of the reasonable investigation standard when it relied on internal records to verify the identity of an alleged debtor.

Section 1681s-2(b) contemplates three potential ending points to reinvestigation: verification of accuracy, a determination of inaccuracy or incompleteness, or a determination that the information "cannot be verified." *See* 15 U.S.C. § 1681s-2(b)(1)(E). Midland argues that once it compared the information the CRAs possessed with its own internal records and confirmed a match, it was entitled to report the accounts as having been "verified." Hinkle

14

argues that the records Midland possessed were insufficient to verify the accounts and that, absent additional proof, Midland should have reported the results of its reinvestigation as "cannot be verified."  We agree with Hinkle that Midland is not entitled to summary judgment under § 1681s-2(b) on the facts of this case.

Our analysis begins with the plain text of § 1681s-2(b), which requires furnishers of information to either "verif[y]" disputed information by means of "investigation," or inform the CRAs that the information "cannot be verified."  *Id.* As the FCRA does not define "verify" or "investigation," we must look to the ordinary meaning of those terms.  *See United States v. Santos*, 553 U.S. 507, 511, 128 S.Ct. 2020, 2024 (2008)) ("When a term is undefined, we give it its ordinary meaning."); *United States v. Lopez*, 590 F.3d 1238, 1248 (11th Cir. 2009) ("To ascertain ordinary meaning, courts often turn to dictionary definitions for guidance.").  The ordinary meaning of "verification" is:  (1) "evidence that establishes or confirms the accuracy or truth of something"; (2) "the process of research, examination, etc., required to prove or establish authenticity or validity"; (3) "a formal assertion of the truth of something, as by oath or affidavit"; and (4) "a short confirmatory affidavit at the end of a pleading or petition."  *Haddad v. Alexander, Zelmanski, Danner & Fioritto, PLLC*, 758 F.3d 777, 782-83 (6th Cir. 2014) (quoting *Random House Unabridged Dictionary* 2113 (2d ed.1993).  "Verify" has a similar meaning in the legal context.  *See Black's Law Dictionary*

1793 (10th ed. 2014) ("**verify** vb. (14c) **1.** To prove to be true; to confirm or establish the truth or truthfulness of; to authenticate. **2.** To confirm or substantiate by oath or affidavit; to swear to the truth of.").  Finally, the term "investigation" is defined as "[a] detailed inquiry or systematic examination" or "a searching inquiry."  *Johnson*, 357 F.3d at 430 (quoting *Am. Heritage Dictionary* 920 (4th ed. 2000); *Webster's Third New Int'l Dictionary* 1189 (1981)).

These definitions support the conclusion that § 1681s-2(b) requires some degree of careful inquiry by furnishers of information.  In particular, when a furnisher does not already possess evidence establishing that an item of disputed information is true, § 1681s-2(b) requires the furnisher to seek out and obtain such evidence before reporting the information as "verified."  *See id.* at 431 (reversing summary judgment because a reasonable jury could find a violation of § 1681s-2(b) where the furnisher "d[id] not look beyond the information contained in the [internal data file] and never consult[ed] underlying documents such as account applications"); *cf. Cahlin*, 936 F.2d at 1160 (observing that a claim for failure to investigate "is properly raised when a particular credit report contains a *factual* deficiency or error that could have been remedied by uncovering additional facts").  The requirement to uncover additional facts will be more or less intensive depending on what evidence the furnisher already possesses.  For instance, a debt buyer with account-level documentation or more comprehensive warranties from

16

its predecessor debt buyer might be in a completely different position than
Midland.

Section 1681s-2(b) does not impose an unduly burdensome investigation
requirement on furnishers; rather, it presents them with a choice regarding how
they handle disputed information.  The first option is to satisfy § 1681s-2(b) by
conducting an investigation, verifying the disputed information, and reporting to
the CRAs that the information has been verified.  Verification might be
accomplished by uncovering documentary evidence that is sufficient to prove that
the information is true.  *See Johnson*, 357 F.3d at 431.  Or it might be
accomplished by relying on personal knowledge sufficient to establish the truth of
the information.  *See* Fed. R. Civ. P. 56(c)(4) (summary judgment affidavit); Fed.
R. Evid. 602 (trial testimony).  When a furnisher reports that disputed information
has been verified, the question of whether the furnisher behaved reasonably will
turn on whether the furnisher acquired sufficient evidence to support the
conclusion that the information was true.  This is a factual question, and it will
normally be reserved for trial.  *See Westra*, 409 F.3d at 827 ("Whether a
defendant's investigation is reasonable is a factual question normally reserved for
trial.").

The second way for a furnisher to satisfy § 1681s-2(b) is to conduct an
investigation and conclude, based on that investigation, that the disputed

information is unverifiable.  Furnishers can avail themselves of this option if they determine that the evidence necessary to verify disputed information either does not exist or is too burdensome to acquire.  Having made such a determination, furnishers are entitled to cease investigation and notify the CRAs that the information "cannot be verified."  *See* 15 U.S.C. § 1681s-2(b)(1)(E).  When a furnisher reports that disputed information "cannot be verified," the question of whether the furnisher complied with § 1681s-2(b) will likely turn on whether the furnisher reasonably determined that further investigation would be fruitless or unduly burdensome.[8]  The final way to satisfy § 1681s-2(b) is to conduct an investigation and conclude that the disputed information is "inaccurate or incomplete."  *Id.*

This framework reflects the fact that §1681s-2(b) is designed not only to exclude false information from credit reports, but also to prevent the reporting of unverifiable information.[9]  When a furnisher determines that disputed information is false or "cannot be verified," the furnisher must notify the CRAs of this result pursuant to § 1681s-2(b)(1).  The furnisher must also "as appropriate, based on the

---

[8] The present case involves a report of "verified" and thus does not require us to delineate a standard for cases involving a report of "cannot be verified."  We emphasize, however, that by characterizing § 1681s-2(b) as presenting a furnishers with a "choice" we do not mean to suggest that furnishers have complete discretion to cease investigation and report accounts as "cannot be verified."

[9] Any other reading would render meaningless the "cannot be verified" option in § 1681s-2(b)(1)(E).  *See Lowery v. Ala. Power Co.*, 483 F.3d 1184, 1204 (11th Cir. 2007) ("[W]e must construe [a] statute to give effect, if possible, to every word and clause.").

results of the reinvestigation promptly . . . modify[,] . . . delete [or] permanently block the reporting" of that information to CRAs.  *Id.* § 1681s-2(b)(1)(E).  What "the results of the reinvestigation" require may vary depending on the nature of the disputed information.  But when a furnisher is unable to verify the identity of an alleged debtor, we are persuaded by the parallel structure of §§ 1681s and 1681i that the appropriate response will be to delete the account or cease reporting it entirely.  *See id.* § 1681i(d) ("Following any *deletion* of information which is found to be inaccurate *or whose accuracy can no longer be verified* [the CRA shall] furnish notification that the item has been deleted . . . to any person specifically designated by the consumer . . . ." (emphasis added)).  Similarly, when a CRA receives notice that an account is unverifiable, it must "promptly delete that item of information from the file of the consumer."  *See id.* § 1681i(a)(5)(A)(i).  Lest this result appear too strict, we hasten to observe that even though a furnisher that ends an investigation without verifying a disputed account must cease reporting the account to CRAs, § 1681s-2(b) does not require the furnisher to cease dunning or otherwise attempting to collect the debt.  The requirement to delete or modify the offending information is limited to the credit-reporting context.  *See id.*

We are not the only circuit court to recognize this framework.  In *Johnson*, the Fourth Circuit considered whether a bank reasonably investigated a dispute alleging that the consumer was not a co-obligor but merely an authorized user on a

credit card account. 357 F.3d at 431. The bank investigated whether the consumer was a co-obligor by "(1) confirming that the name and address listed on the [dispute] were the same as the name and address contained in [its computerized data file], and (2) noting that [the data file] contained a code indicating that [the consumer] was the sole responsible party on the account." *Id.* The bank "d[id] not look beyond the information contained in the [data file] and never consult[ed] underlying documents such as account applications." *Id.* The Fourth Circuit held that "[b]ased on this evidence, a jury could reasonably conclude that [the bank] acted unreasonably" when it reported to the CRA that the disputed information was "verified." *Id.* The bank argued that its reliance on computerized data was reasonable because it had destroyed any account-level documentation pursuant to a document retention policy. *Id.* at 432. But the court rejected this argument, explaining that a reasonable jury could find that the bank should have "at least informed the credit reporting agencies that [it] could not conclusively verify" the disputed information. *Id.*

The reasoning of *Johnson* is doubly persuasive in the case of a down-the-line buyer like Midland. Faced with a mistaken-identity dispute, Midland investigated the dispute by confirming that the identifying information possessed by the CRAs was the same as the identifying information contained in its internal data files. The information contained in the data files was obtained from AIS and

DRS—not from the original creditors—and was the same information Midland had

reported to the CRAs in the first place.  Midland did not attempt to consult

account-level documentation to confirm that the "Terri Hinkle" and "Teri Hinkle"

who incurred the debts in 2005-2006 were the same "Teri Lynn Hinkle" it was

dunning six years later.  A reasonable jury could find that such a cursory

investigation was unreasonable on the facts of this case.  A jury could find that the

documentation Midland reviewed was insufficient to prove that the GE/Meijer and

T-Mobile accounts belonged to Hinkle and that Midland therefore had a duty to

report the accounts as "cannot be verified."  *See* 15 U.S.C. § 1681s-2(b)(1)(E).  A

jury could also find that because Midland retained the right to seek account-level

documentation through its agreements with AIS and DRS, Midland behaved

unreasonably when it reported the accounts as "verified" without first exercising

those rights.

The Seventh Circuit's decision in *Westra* does not persuade us otherwise.

That case affirmed summary judgment in favor of a collection agency "collecting

on behalf of [an original creditor]," holding that the agency conducted a reasonable

investigation when it relied on internal records to verify a disputed debt.  *Westra*,

409 F.3d at 826-27.  Upon notification that an account "did not belong to" the

alleged debtor, the collection agency verified the "name, address, and date of birth"

on the account—just as Midland did in this case—"and sent the [dispute] back to

[the CRA]." *Id.* at 827.  But Midland is not a collection agency "collecting on behalf of [the original creditor]." *Id.* at 126.  Although *Westra* does not discuss the reliability of the internal records at issue, it is reasonable that, as an agent of the original creditor, the *Westra* defendant could more reasonably rely on its internal records than can Midland.  Midland is a down-the-line buyer that purchased the GE/Meijer and T-Mobile accounts "as is," with no account-level documentation, and only after the accounts had changed hands repeatedly in the secondary debt market.  Although AIS and DRS warranted that the electronically-stored information Midland received was correct "[t]o the best of [their] knowledge," they made no warranties as to whether the personal information associated with the debts was obtained from the original creditor or compiled at a later time by way of background checks, internet research, or other means.[10]  There is no way to know how many times the information Midland furnished to the CRAs changed hands or was altered before finding its way to Midland.  Because *Westra* involved a collection agency in a direct relationship with the original creditor, it has little persuasive value in the instant case.

Midland advances two arguments in support of its contention that the facts of this case warranted less-extensive investigation.  Midland first argues that the

---

[10] For example, the purchase agreement for the T-Mobile account warrants that the data file purchased "constitutes [DRS's] business records," was "made or compiled" by DRS, and was recorded *either* by a person "with knowledge of the data entered" *or* by a person "who caused the data to be entered."

act of sending a letter to Hinkle shifted the burden to Hinkle to substantiate her dispute. The letter in question stated that "[a]s part of our investigation . . . it would be helpful to have a copy of any documentation you may have that supports your dispute." Midland argues that when Hinkle failed to support her dispute by sending Midland a police report or a signed fraud affidavit, Midland was entitled to cease its investigation and inform the CRAs that the debts were accurate and had been "verified." Although the failure to respond to a letter requesting assistance might be relevant to a jury's determination of whether Midland was entitled to report the debt as "verified"—as evidence, for example, that Hinkle's dispute was disingenuous—we are unprepared to say that it is dispositive at summary judgment. Midland cites nothing in the FCRA that permits a furnisher to shift its burden of "reasonable investigation" to the consumer in the case of a § 1681s-2(b) dispute. And even if there were a scenario in which burden shifting were appropriate, that result would make little sense in a case like this one—a mistaken-identity dispute in which the furnisher is in a far better position than the alleged debtor to confirm the actual owner of the account. In any event, the letter at issue in this case did not inform Hinkle that she was required to send documentation. Rather, the letter suggested that "it would be helpful" if she did so. A reasonable jury could find that Midland acted unreasonably when it conditioned further

investigation on a response from Hinkle without informing Hinkle of that requirement.

Midland also argues that its investigative burden was less extensive because the notice of dispute it received from the CRAs stated only that the GE/Meijer and T-Mobile accounts were "[n]ot his/hers." *See Gorman*, 584 F.3d at 1157 ("The pertinent question is . . . whether the furnisher's procedures were reasonable in light of what it learned about the nature of the dispute from the description in the CRA's notice of dispute."); *Westra*, 409 F.3d at 827 ("[The] investigation in this case was reasonable given the scant information [the furnisher] received regarding the nature of [the] dispute."). Although we agree that whether an investigation is reasonable will depend on what the furnisher knows about the dispute, we reject the proposition that a furnisher may truncate its investigation simply because the CRA failed to exhaustively describe the dispute in its § 1681i(a)(2) notice. *See Gorman*, 584 F.3d at 1157 n.11 (explaining that although "the notice determines the nature of the dispute to be investigated" it does not "cabin[] the scope of the investigation once undertaken"). When a furnisher has access to dispute-related information beyond the information provided by the CRA, it will often be reasonable for the furnisher to review that additional information and conduct its investigation accordingly. Here, the CRAs notified Midland variously that Hinkle "states inaccurate information," "[c]laims true identity fraud, account fraudulently

24

opened," and disputes the accounts as "[n]ot his/hers."  They further instructed Midland to "[v]erify" the information reported.  Midland was also aware of the basis for dispute because Hinkle herself told Midland repeatedly that the GE/Meijer and T-Mobile accounts did not belong to her.  A jury could find that these communications were enough to convey to Midland that the basis of dispute was mistaken identity or fraud.

Midland finally asserts that we should affirm the district court on the alternate basis that Hinkle cannot prove a "willful" violation of § 1681s-2(b).  But a reasonable jury could find that Midland either knowingly or recklessly reported debts as "verified" without obtaining sufficient documentation to support that determination.  *See Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, 56-57, 127 S. Ct. 2201, 2208 (2007) (holding that liability for "willfully" failing to comply with the FCRA extends not only to acts known to violate the FCRA, but also to the reckless disregard of a statutory duty).  First, the fact that Midland negotiated clauses in the purchase agreements requiring the sellers to assist with obtaining account-level documentation supports the conclusion that Midland knew it might need such documentation to "verify" disputed accounts.  Second, the record supports an inference that the system Midland uses to verify information is automated and does not incorporate review by Midland employees capable of analyzing disputed accounts and initiating requests for account-level documentation where

appropriate.  A reasonable jury could find that Midland adopted such a system with reckless disregard for the fact that it would result in perfunctory review in contravention of the FCRA.  We therefore hold that a reasonable jury could find that Midland willfully violated § 1681s-2(b) when it reported the GE/Meijer and T-Mobile accounts as "verified" without obtaining sufficient documentation that the debts in fact belonged to Hinkle.

## V.  CONCLUSION

For the foregoing reasons, we conclude that the district court erred in dismissing Hinkle's claims under 15 U.S.C. § 1681s-2(b).  We reverse and remand as to § 1681s-2(b).  We affirm dismissal of all other claims.

**AFFIRMED IN PART, REVERSED AND REMANDED IN PART.**

# UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

David J. Smith
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

July 11, 2016

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 15-10398-FF
Case Style: Teri Hinkle v. Midland Credit Management, Inc, et al
District Court Docket No: 3:13-cv-00033-DHB-BKE

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, each party to bear own costs.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Janet K. Mohler, FF at (404) 335-6178.

Sincerely,

DAVID J. SMITH, Clerk of Court

Reply to: Djuanna Clark
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs